Dighton PACKARD, M.D., Emergency Health Services Associates, EmCare, Inc. and EmCare Holdings, Inc. and Leonard M. Riggs, Jr., M.D., Appellants,

v.

Lillian GUERRA, Individually and as next friend of Marcela Lillian Guerra and Marcelino Guerra, Appellees.

No. 14–06–00546–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 28, 2008.

Rehearing Overruled April 24, 2008.

Mary Olga Lovett, Christopher Cord Miller, Andrew J. Wupper, Houston, for appellants.

James M. Stewart, Brent Ryan Walker, Dallas, Dallas, for Leonard M. Riggs.

Jack E. McGehee, John S. Serpe, Christopher Dean Demeo, Houston, for appellees.

Panel consists of Justices ANDERSON and FOWLER and Senior Justice EDELMAN.*

## MAJORITY OPINION

WANDA McKEE FOWLER, Justice.

This is a health care liability claim in which the plaintiffs allege that Marcela Guerra received permanent brain injuries because of the actions and non-actions of the attending emergency room doctor at Polly Ryon Hospital immediately after her birth. The Guerras allege that one or more of the defendant companies and individuals contracted to staff and run the emergency room at Polly Ryon Hospital.

In this interlocutory appeal, we are asked to consider whether the medical expert reports of several doctors can be considered collectively to meet the requirements of an expert report and whether they meet the requirements of expert reports even if they are considered together. And, in a case of first impression, we also are asked to decide if, under sections 74.401(d) and 74.402(d) of the Texas Civil Practice and Remedies Code, for good cause the trial judge could properly con-

* Senior Justice Richard H. Edelman, sitting by assignment.

sider the non-medical expert report of a lawyer who explained the duties and responsibilities of several business/corporate entities and the two doctors who were officers and/or directors of the companies.

We hold that the expert reports of the doctors can be considered together to supply the expert testimony on standard of care, breach and causation. We also hold that the trial court properly relied on the expert report of a corporate lawyer to define and explain what appellants promised to do for Polly Ryon Hospital (i.e., allegedly manage and staff its emergency room with doctors), and what level of responsibility each had in fulfilling that promise. Finally, we hold that the expert reports in the aggregate adequately address the standard of care, breach of the standard of care, and causation on the part of each defendant/appellant.

**Factual and Procedural Background**

### The Factual Allegations

In January 2005, Lillian and Marcelino Guerra sued Clement Ugorji, M.D., alleging medical negligence in the care and treatment of herself and her newborn infant, Marcela,[1] at Polly Ryon Memorial Hospital. Among other things, the Guerras alleged that Dr. Ugorji was absent when Marcela was born and absent for the following four to five minutes. Following her birth, Marcela was in need of respiratory assistance. But, when Dr. Ugorji attempted to rectify Marcela's breathing difficulties, they allege he misplaced an endotracheal tube intended to assist Marcela's respiration, causing further respiratory problems. And they claim that Dr. Ugorji also failed to give Marcela glucose. The Guerras claimed that these and other mistakes caused Marcela's permanent, severe brain damage.

The Guerras later amended their petition to allege direct and vicarious liability for Dr. Ugorji's treatment against entities they claimed were in charge of managing and staffing the emergency room—Emergency Health Services Associates ("EHSA"), EmCare, Inc., EmCare of Texas, Inc., EmCare Holdings, Inc., EmCare O.P., L.P., EmCare (a registered trademark), Emergency Medical Services, L.P., Leonard M. Riggs, Jr., M.D., and Dighton Packard, M.D.[2] Neither Dr. Riggs nor Dr. Packard treated Lillian or Marcela Guerra, but the Guerras alleged Dr. Riggs and Dr. Packard were liable in both their individual capacities and their corporate capacities based on their positions as officers, directors, members, shareholders, or employees of the defendant entities.[3]

---

1. Marcela's name sometimes appears in the record as "Marcella." We will spell Marcela's name as it appears in the caption of the Guerras' original petition, but may use the other spelling as necessary when quoting the record.

2. Other entities may also have been sued; however, the parties did not include all of the amended petitions, and so we cannot determine with certainty all defendants that may have been named during the pendency of the suit. We are able to list these specific entities because they are listed in the Guerras' fourth amended petition or in the trial court's order denying the motions to dismiss as to some of the entities and granting the motions as to

some. Again, as we have already noted, only the direct liability of the appellants is involved on appeal.

3. The Guerras alleged that Dr. Riggs was the sole officer, physician, principal, member, director and employee of EHSA, and the CEO of EmCare, Inc., and EmCare Holdings, Inc., and that Dr. Packard was the Chief Medical Officer for EmCare, Inc. They further alleged that Dr. Ugorji was the agent of Riggs, Packard, and the entities. Attorney Adrienne Bond identified additional corporate relationships in her report. The record does not include the contracts and other documents on which the alleged relationships are based.

The Guerras alleged that the entities were engaged in the practice of medicine in Texas, and that the entities were responsible for staffing, supervising, and providing medical care to ·patients in the emergency department at Polly Ryon Memorial Hospital, and that their failures in these responsibilities caused Marcela's brain damage.[4]

The Guerras also claimed that Dr. Packard and Dr. Riggs were directly liable, but included allegations of liability based on alter ego, piercing the corporate veil, single business enterprise, joint venture, and vice principal.[5]

### The Expert Reports are Filed

The Guerras first filed the expert report of Timothy Cooper, M.D., pursuant to section 74.351 of the Texas Medical Liability Act.[6] *See* TEX. CIV. PRAC. & REM. CODE § 74.001–.507. Dr. Cooper's report was directed to the breaches of Dr. Ugorji and the "Entities," which included the corporate entities and Drs. Packard and Riggs individually and in their employment capacities. The defendants challenged the adequacy of Dr. Cooper's expert report and moved to dismiss the Guerras' claims against them. The trial court denied the challenge to the adequacy of the expert report as to Dr. Ugorji, and this ruling was not appealed. In response, the Guerras filed an additional expert report by Andrew P. Garlisi, M.D., regarding EmCare, Inc., EmCare of Texas, Inc., EmCare Holdings, Inc., EmCare, EHSA, EmCare O.P., L.P., Dr. Packard, and Dr. Riggs.[7] The defendants again objected to the adequacy of the Guerras' expert reports and moved to dismiss their claims.

The trial court ruled that the expert reports of Drs. Cooper and Garlisi were "deficient, but good faith efforts to comply with Section 74.351." Specifically, the court found the reports to be "conclusory" as to Drs. Packard and Riggs, and further found that Dr. Garlisi's report seemed to assume that the contractual duties with Polly Ryon Hospital defined the standard of care relating to the medical care given to Marcela. The court ordered that the Guerras correct these deficiencies within thirty days.

In response to the trial court's order, the Guerras supplemented their expert reports. The supplement included copies of the earlier expert reports of Drs. Cooper and Garlisi, supplemental reports by Dr. Garlisi, and new reports from Albert C. Weihl, M.D., and from Adrienne Randle Bond, a non-physician corporate lawyer. For a third time, the defendants moved to dismiss the Guerras' claims for failing to timely file a compliant expert report and sought attorney's fees.

The trial court first denied Dr. Riggs' motion to dismiss. In its order, the trial court noted that it "did *not* rely upon Ms. Bond's report for any causation opinions she may have rendered." Further, the court stated the following after citing to Texas Civil Practice and Remedies Code sections 74.401(d) and 74.402(d):

> [T]he Court finds good cause to permit plaintiffs to file, and for their expert report physicians to rely upon, the report of Adrienne R. Bond, a non-physician expert in legal and corporate contracts. Specifically, the Court finds that

---

4.  The petition alleged many other breaches of responsibilities by the entities, but they are either irrelevant to this appeal or will be discussed in more detail during the discussion of the expert reports.

5.  The Guerras added other allegations against other defendants but, again, they are unnecessary to this discussion.

6.  This report was filed in May of 2005.

7.  This first report by Dr. Garlisi was filed in September of 2005.

the contractual and corporate inter-relationships of the various defendants, including specifically Dr. Leonard Riggs and several of the corporate defendants, render such an expert report helpful (if not absolutely necessary) to demonstrating the duties owed and to assisting the physician experts in their presentations of the applicable standards of care. Such corporate and legal testimony would not be within the experience of a typical physician otherwise qualified to render a report in this case.

And, the trial court, in a reformed order, denied the motion to dismiss as to the Guerras' claims of direct liability against Dr. Packard, EmCare, Inc., EmCare Holdings, Inc., and EHSA.[8] In its order concerning these defendants, the trial court included the following:

> In so ruling, the Court considered and relied upon the non-medical expert report of Adrienne R. Bond, for the good cause stated in the Court's Order, of June 14, 2006, denying Dr. Leonard Riggs' Motion to Dismiss. See TEX. CIV. PRAC. & REM. CODE Sections 74.401(d) and 74.402(d). The Court did not consider nor rely upon the Bond report for any issue pertaining to medical causation.

This interlocutory appeal followed. See TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

### Analysis of Appellants' Issues

On appeal, appellants contend generally that the trial court erred in denying their motions to dismiss the Guerras' claims because the Guerras' expert reports are insufficient.[9] They claim the doctors' reports cannot be read collectively and that,

individually, they do not address the three items of proof necessary for an expert report—standard of care, breach, and causation. Appellants also claim that Adrienne R. Bond's report cannot be relied on for any reason because she fails to meet the qualifications necessary for an expert in a health care liability claim.

### A. Standard of Review.

We review a trial court's decision on a motion to dismiss under Texas Civil Practice and Remedies Code section 74.351 for an abuse of discretion. See Estate of Regis ex. rel. McWashington v. Harris County Hosp. Dist., 208 S.W.3d 64, 67 (Tex.App.-Houston [14th Dist.] 2006, no pet.). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. See Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex.2002). However, to the extent resolution of the issues presented requires interpretation of the statute, we review the order under a de novo standard. See Buck v. Blum, 130 S.W.3d 285, 290 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

### B. Expert Reports and Texas Civil Practice and Remedies Code Section 74.351.

We begin our discussion with section 74.351 of the Texas Civil Practice and Remedies Code, which requires an expert report in a health care liability claim.

> (a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports, with a

---

**8.** The trial court dismissed with prejudice the Guerras' claims of direct liability against EmCare, EmCare of Texas, Inc., EmCare O.P., L.P., and Emergency Medical Services, L.P. The trial court's order specifically noted that the order did not affect any of the Guerras'

theories of indirect or vicarious liability against any defendant.

**9.** We will refer to appellants EmCare, Inc., EmCare Holdings, Inc., and EHSA as the "EmCare Entities" as the context requires.

curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. . . . .

*See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1, 2005 Tex. Gen. Laws 1590, 1590 (current version at TEX. CIV. PRAC. & REM. CODE § 74.351(a)). In a health care liability claim, which this suit is, an expert report must meet certain requirements. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(13).

To be adequate under section 74.351, an expert's medical liability report must establish his or her qualifications, the applicable standard of care, how the standard was breached by the particular actions of the defendant, and how that breach caused the plaintiff's alleged damages. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), 74.351(r)(5)-(r)(6). To constitute a good faith summary of the expert's opinions, a report must do more than merely state the expert's conclusions. It must fulfill two purposes: (1) inform the defendant of the specific conduct that is being called into question, and (2) provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

### C. The Expert Reports.

Because the expert reports are the focal point of this appeal, we summarize and set out parts of them below.

### 1. Dr. Cooper's and Dr. Garlisi's Initial Reports Re-filed.

In their supplemental reports, the Guerras included the expert reports previously offered and found by the trial court to be deficient, but good faith efforts to comply with the statutory requirements. The purpose of Dr. Cooper's report was to explain the standard of care, the breach of the standard of care, and causation for the medical care Dr. Ugorji provided.[10] Dr. Cooper's report focused primarily on Dr. Ugorji's actions and non-actions, but also opined that appellants were responsible for Ugorji's negligence and gross negligence, based on appellants' relationships with Dr. Ugorji and their corporate duties and responsibilities. Dr. Cooper's report referred collectively to the "Entities." Dr. Garlisi's initial report was offered to outline the standard of care and causation as to each individual appellant.

### 2. Dr. Weihl's Report.

Dr. Weihl's report explains (1) that the standard of care required appellants to implement a quality assurance program, (2) that Marcela's injuries were caused by the appellants' failures to implement and/or follow a quality assurance program, and (3) what a quality assurance program consistent with the standard of care should have included. The substance of his report is as follows:

> While I cannot provide a 100% guarantee, it is my expert opinion that, in reasonable medical probability, had appropriate on-site supervision, training and management of Dr. Ugorji been provided with respect to the medical care provided by Dr. Ugorji in the Polly Ryon Memorial Hospital Emergency Department, Marcella Guerra's injury on November 2, 1998 would have been avoided. In reasonable medical probability, the development and training and management of Dr. Ugorji would have identified Ugorji's lack of knowledge and qualifications in dealing with neonatal resuscitation, including his inability to:

---

**10.** As we noted earlier, as to Dr. Ugorji, the trial court held that Dr. Cooper's report was sufficient, and that decision was not appealed.

adequately perform neonatal intubation; timely determine, recognize and correct improper intubations, including esophageal and right main-stem bronchus intubations; timely and adequately determine glucose levels and glucose needs of neonates; and timely respond to circumstances requiring the immediate engagement of a specialist. The identification of Dr. Ugorji's lack of knowledge and qualifications would have resulted in the removal of Dr. Ugorji or the provision of adequate training for Dr. Ugorji. As a result, in reasonable medical probability, the injury to Marcella Guerra would have been prevented.

### 3. Attorney Adrienne Bond's Report.

The Guerras also tendered the report of Adrienne Randle Bond, a corporate attorney.[11] Ms Bond's expert report addressed the issues of corporate and director responsibility on the part of Dr. Packard, Dr. Riggs, and the EmCare Entities with respect to (1) Dr. Ugorji's status as an agent and/or employee of the EmCare Entities; (2) the relationships of control among the various entities, Dr. Packard, Dr. Riggs, and Dr. Ugorji; (3) the responsibilities of the EmCare Entities and Dr. Packard and Dr. Riggs as officers of EmCare, Inc. and interest-holders of EHSA to implement their own corporate policies and procedures; and (4) the relationships and facts underlying vice principal liability, alter ego liability, and single business enterprise liability. In forming her opinions, Bond considered, among other things, corporate documents, depositions, and information from public sources. Bond set out in detail the basis for each of her opinions that Dr. Packard, Dr. Riggs, and the EmCare Entities are directly liable for the November 2, 1998 incident involving Marcela Guerra. For example, as to EHSA, Bond opined as follows:

Based on the review of the facts with respect to the relationship with Ugorji, he was, in fact, an employee of EHSA and Emcare, and was certainly an agent of EHSA and Emcare. First, EHSA, was the entity under contract with Polly Ryon Hospital to provide emergency room physicians. Further, EHSA was a Texas professional association, the state law entity that could legally provide medical services. EHSA and Dr. Riggs further had (a) a contractual obligation to supervise the physicians retained by it for the benefit of Polly Ryon Hospital, and (b) to implement a quality assurance program. Ugorji, as a licensed physician, was employed or retained to provide emergency room services on behalf of EHSA, based on EHSA's contract with Polly Ryon. Ugorji's relationship was that of an employee of, and also an agent of EHSA, thus rendering EHSA liable. Additionally, EHSA and Dr. Riggs are directly liable for failure to supervise, and to implement quality control procedures that were already in place and to appoint a physician on site

---

**11.** Part of Bond's summary of her qualifications, which appellants have not attacked, is as follows:

I earned a J.D. degree from Columbia University School of Law in 1980, a B.A. degree from Rice University in 1980 and was admitted to the Texas State Bar in 1980. Since 1980, I have been in the private practice of law in Houston, Texas specializing in securities law, corporate and partnership law and merger and acquisition transactions. I am currently in private practice in my own office. I have taught Business Organizations and Securities Regulation as an adjunct professor of the University of Houston, and since 1983, I have taught extensively for the continuing education programs in the areas of corporate and securities law for the State Bar of Texas, the University of Texas, the University of Houston, South Texas College of Law and the Practising Law Institute, and in connection therewith have published many articles in these areas.

for quality assurance purposes, as required under law and under its contractual agreements with Polly Ryon Hospital. EHSA and Dr. Riggs are directly responsible for failing to follow its established quality assurance programs and procedures.

Concerning EmCare, Bond opined:

Emcare, however, is also directly liable as an employer/principal through its relationship with Ugorji and EHSA. With respect to Emcare's relations with Ugorji, in all of the written employment records of Ugorji, Emcare is the entity with whom Ugorji had contact. His application for employment with, and all correspondence concerning that application was made to Emcare. All of Ugorji's personnel files and medical records were maintained by Emcare, and he reported the hours that he billed to Emcare. During the time in question, Emcare was in the process of nominally changing the name of its relationship with Ugorji to that of "employee" since Emcare could not legally sustain the argument that Ugorji was not an employee.

Next, upon review of the legal structure of Emcare and EHSA described above, including the Management Services Agreement, the Succession Agreement, the Stock Transfer and Option Agreement, and as described in the SEC reports and notes to Emcare's audited financial statements, Emcare wholly controlled EHSA. Emcare controlled all of the activities conducted by EHSA, including the control of all funds, control of billing and collection, control of accounting, control of scheduling of Ugorji, and maintenance of all required activities of EHSA, except for the one limited matter of making a medical diagnosis, although Emcare remains fully liable as the employer/principal of the physician that makes any diagnosis. The legal structure of Emcare OP, L.P. also holds Emcare, Inc. fully liable under the Management Agreement, since Emcare was the general partner of that limited partnership. As a general partner under state law, there is no liability shield and Emcare is wholly and completely liable thereunder.

Emcare also admits in its SEC reports that the use of the EHSA structure was solely to avoid state laws prohibiting the corporate practice of medicine. Emcare is further liable directly for failing to follow its own internal procedures (as described in their management contracts and corroborated in their SEC reports) for implementing a quality assurance program at Polly Ryon Hospital and for failing to appoint a physician on site to monitor the quality assurance program. Emcare is directly responsible for failing to follow its established quality assurance programs and procedures.

Emcare also had the benefit of all of the net revenues of EHSA, and, according to its SEC reports, so completely controlled EHSA that the certified public accountants who audited the financial statements of Emcare for SEC reporting purposes attributed all of EHSA's revenues to Emcare. Since Emcare wholly controlled EHSA, Emcare was, in fact, practicing medicine and was the employer of Ugorji. One particularly telling fact about the complete control of EHSA by Emcare is that they did not maintain any "tail" coverage for EHSA with respect to Polly Ryon Hospital. Had EHSA truly been independently managed, it would have enforced its rights to have Emcare assure that "tail" malpractice coverage was in place for the benefit of EHSA physician/employees at Polly Ryon Hospital. Since Emcare was practicing medicine by its complete control of EHSA, Emcare is directly liable for failure to supervise or

provide for quality assurance programs as required under law and under its contractual agreements with Polly Ryon Hospital. As a result, as an entity practicing medicine and as an employer and principal of Ugorji, Emcare and its assets [are] fully and directly liable for the incident on November 2, 1998.

Additionally, as to Riggs' and Packard's direct liability, Bond opined as follows:

> Riggs was the sole owner of EHSA and an officer and director of EHSA and Emcare. In all of those capacities, he has personal responsibility for the preparation and implementation of procedures for quality assurance, both in his capacity as an officer and director, and also as a result of his responsibility for the contractual obligations of EHSA and Emcare. Packard was the Chief Medical Officer of Emcare, and of EHSA, and he was the officer specifically in charge of quality assurance and risk management. Therefore he has personal responsibility for the preparation and implementation of procedures for quality assurance. Both of them testified that they had no idea of the activities or quality assurance programs at Polly Ryon Hospital. As a result, Riggs and Packard are fully and directly liable for the failure to supervise or provide for quality assurance programs [as] required under law and under Emcare's and EHSA's contractual arrangements with Polly Ryon Hospital.

**4. Dr. Garlisi's Supplemental Reports.**

The Guerras also included supplemental reports from Dr. Garlisi for each of the defendants. These reports were substantively similar, except for substituting the names of each appellant and certain specific allegations in separate reports. Based upon Adrienne Bond's report, Dr. Garlisi ascribes the same standard of care and breaches of the standard of care to Dr. Riggs, Dr. Packard, and the EmCare Entities.

To illustrate Dr. Garlisi's reports as to the EmCare Entities, we set forth the substance of his report as to EHSA. For the convenience of the reader, we have added bolded, bracketed notations identifying the basis of liability being addressed in some parts of the report:

> As set forth in my 120–day report dated September 11, 2005 and in Dr. Cooper's deposition, it is my opinion that Dr. Clement Ugorji, as the agent of Emergency Health Services Associates (hereinafter "EHSA"), Dr. Riggs, Dr. Dighton Packard, EmCare, Inc., EmCare Holdings, Inc., and EmCare, provided medical care to Marcella Guerra on November 2, 1998 that was in breach of the applicable standard of care and that in reasonable medical probability caused the devastating and permanent brain injury suffered by Marcella Guerra. As additionally set forth in my September 11, 2005 120–day report, it is also my opinion that EHSA, acting through Dr. Leonard M. Riggs, Dr. Clement Ugorji, and its other agent(s) was responsible for the medical care provided by Dr. Ugorji and the injury to Marcella Guerra that in reasonable medical probability was caused by Dr. Ugorji's breach of the standard of care. The following opinions are in clarification and supplementation of my opinions set forth in my September 11, 2005 120–day report that EHSA, acting through its agent, Dr. Ugorji, was responsible for Marcella Guerra's injury:
>
> 1. Dr. Ugorji was the agent of ESHA at Polly Ryon Memorial Hospital on November 2, 1998. Therefore, EHSA is directly responsible for the care provided to Marcella Guerra by Dr. Ugorji on November 2, 1998. As set forth in its Articles of Associ-

ation, EHSA was formed for the sole purpose of "engaging in the practice of medicine." Subsequent to its formation, EHSA entered into a contract with Polly Ryon Hospital Authority "to provide medical services to the Emergency Department" of Polly Ryon Memorial Hospital. Dr. Ugorji provided medical care in the Polly Ryon Memorial Hospital Emergency Department to Marcella Guerra on November 2, 1998 as the agent of ESHA and EmCare, Inc. The provision of medical care is a non-delegable duty. Therefore, EHSA, acting by and through Dr. Leonard M. Riggs (the 100% shareholder of ESHA, the sole officer and sole member of the board of directors of ESHA, and officer of EmCare, Inc. and EmCare Holdings, Inc.), Dr. Dighton Packard (the Chief Medical Officer of EmCare, Inc., an entity in control of EHSA, and an officer of EHSA and party to a succession of control agreement regarding the control of EHSA that was entered into for the benefit of EmCare, Inc. and EmCare Holdings, Inc.), and its other agent(s), was directly responsible for the medical care provided to Marcella Guerra by Dr. Ugorji, including any breach of the standard of care and resulting injury. The provision of that medical care was EHSA's direct responsibility and it was provided in breach of the standard of care to the injury of Marcella Guerra as set forth in detail in my September 11, 2005 120–day report.

2.  As set forth in detail below, EHSA is also responsible for Dr. Ugorji's breach of the standard of care and resulting injury to Marcella Guerra for failure to implement quality control procedures and programs that would in reasonable medical proba-

bility have prevented the injury to Marcella Guerra. **[Standard of care follows.]** EHSA, as an entity whose sole purpose was to practice medicine, had a duty to ensure that any physician practicing medicine through the Polly Ryon Memorial Hospital Emergency Department on November 2, 1998, did so consistent with the standard of care. This duty existed independently of any contractual obligation due to the fact that EHSA was responsible for providing, and was in fact providing, medical care through the Polly Ryon Memorial Hospital Emergency Department. This duty required EHSA, through Dr. Riggs, Dr. Packard or their designated agent(s), to provide on-site supervision and management of physicians, including Dr. Ugorji, who provided medical care through the Polly Ryon Memorial Emergency Department to ensure that such physicians, including Dr. Ugorji, had the requisite skills, as well as competency in performing those skills, to provide the medical procedures and services needed by patients coming to the Polly Ryon Memorial Hospital Emergency Department for medical care. It was insufficient for them to rely on the Hospital Trustees who had granted privileges in the past to Dr. Ugorji or on Dr. Ugorji's ACLS and/or ATLS cards. This duty also required EHSA, through Dr. Riggs, Dr. Packard or their designated agent(s), to develop and implement quality control procedures and programs to monitor competency and continued competency and provide continued training to physicians, including Dr. Ugorji, who were providing medical care through the Polly Ryon Memorial

Hospital Emergency Department. **[The elements of a quality control program.]** Among other things, that program would have included monitoring and training in: neonatal intubation, determination of proper intubation, determination of esophageal and other improper intubation, recognition of esophageal intubation, recognition of signs and symptoms of esophageal intubation, correction of improper intubation, administration of glucose and monitoring of glucose levels, and determination of circumstances requiring the immediate engagement of a specialist.

**[Breach.]** According to Dr. Riggs' and Dr. Ugorji's testimony, none of the above responsibilities were met. (Dr. Packard, whose responsibilities, as the Chief Medical Officer of EmCare, Inc., the entity that controlled EHSA, included development, implementation and oversight of the above programs, testified that he didn't know anything about what was going on at Polly Ryon, thereby admitting disregard of his duty.) There was no on-site medical director from EHSA or any EmCare entity monitoring or supervising Dr. Ugorji's competency. There was also no quality assurance program in place or implemented by EHSA or any EmCare entity at Polly Ryon Memorial Hospital to monitor and supervise Dr. Ugorji in the above procedures. **[Causation.]** Had regular and periodic supervision, monitoring and quality assurance programs and procedures been in place, in reasonable medical probability Dr. Ugorji's obvious incompetence to timely recognize and correct an improper intubation and properly administer glucose would have been determined and he would have either been removed or trained so that he could competently perform the above procedures and make the appropriate determinations about the care needed by Marcella Guerra and her injury in reasonable medical probability would have been prevented.

Dr. Ugorji's incompetence to timely recognize and properly correct an improper intubation is evidenced in the medical records, the deposition of Dr. Cooper, the deposition of Dr. Weihl and in glaring form in Dr. Ugorji's own testimony insisting that he had not performed an esophageal intubation or other improper intubation on Marcella Guerra, despite clear evidence in a chest x-ray and other indications in the medical records of physical manifestations that he and/or his supervisee had in fact first performed an esophageal intubation and second an intubation in the right mainstem bronchus depriving Marcella Guerra's brain of vital oxygen and causing permanent, devastating and irreversible injury to her brain. Dr. Ugorji's incompetence to determine Marcella Guerra's need for immediate glucose administration and monitoring is also evidenced in the medical records, which indicate that no glucose was ordered until midnight and the Dr. Ugorji allowed Marcella Guerra's glucose level to drop to 5.

3. As set forth in detail below, EHSA is also responsible for the brain injury to Marcella Guerra caused by the medical care provided to her by Dr. Ugorji in breach of the standard care because under the terms of the contract between Polly Ryon Memorial Hospital and EHSA, and the "Management Services Agreement By and Between EmCare, OP, L.P. and EHSA", EHSA had an obligation through Dr. Riggs, Dr. Packard, and/or their designated

agent(s), to "confirm," either personally or through an agent, that Dr. Ugorji "assessed every patient who presented to the Emergency Department for treatment by an Emergency Physician to ensure that the immediate medical needs of such patient were not jeopardized" and "treated patients consistently with the facilities available and the standards established in the medical community of which the Hospital is a part." EHSA, through Dr. Riggs, Dr. Packard, or their designated agent(s), also had an obligation to implement, either personally or through an agent a "quality assurance program to monitor and evaluate the quality and cost-effectiveness of Emergency Department Medical Services provided by physician personnel," whether employees or independent contractors, of EHSA and to "resolve medical competence issues." The Management Services Agreement also provided that EHSA "through its physicians shall have complete authority, responsibility, supervision, and control over the provision of all Emergency Department Medical Services" and that it was to work with the hospital to make "formal written policies and procedures" to ensure quality care. The medical records and Dr. Ugorji's testimony confirm that Polly Ryon Memorial Hospital Emergency Department had the facilities available to properly intubate Marcella Guerra, to determine and immediately correct any incorrect intubation of Marcella Guerra, and to properly monitor glucose levels and provide appropriate and timely glucose to Marcella Guerra. Yet, as set forth in detail in my September 11, 2005 120–day report, the medical records, the testimony of Dr. Ugorji, Lillian Guerra and other

witnesses, and the depositions of Dr. Cooper and Dr. Weihl establish that Dr. Ugorji's care of Lillian and Marcella Guerra jeopardized the immediate medical needs of Marcella and Lillian Guerra and was inconsistent and in breach of the medical standards of care established by the medical community of which the Hospital is a part. In addition, the testimony of Dr. Riggs, Dr. Packard and Dr. Ugorji establishes that no steps whatsoever were taken to meet the above obligations under the EHSA contract with Polly Ryon Hospital Authority or the contract between ESHA and Emcare OP, L.P. There was no onsite medical director in place to monitor or supervise care nor was there any quality assurance program in place or implemented to ensure that the above obligations were met. The above obligations required that at a minimum the competency of Dr. Ugorji be monitored and supervised and that continued training be provided to physicians, including Dr. Ugorji, who were providing medical care through the Polly Ryon Memorial Hospital Emergency Department. Among other things, that program would have included monitoring and training in: neonatal intubation, determination of proper intubation, determination of esophageal and other improper intubation, recognition of esophageal intubation, recognition of signs and symptoms of esophageal intubation, correction of improper intubation, administration of glucose and monitoring of glucose levels, and determination of circumstances requiring the immediate engagement of a specialist.

According to Dr. Riggs' and Dr. Ugorji's testimony, none of the above responsibilities were met. There was

no on-site medical director from Em-Care, Inc., EHSA or any EmCare entity monitoring or supervising Dr. Ugorji's' competency. There was also no quality assurance program in place or implemented by EmCare, Inc., EHSA or any EmCare entity at Polly Ryon memorial Hospital to monitor and supervise Dr. Ugorji in the above procedures. Had the above periodic and regular supervision, monitoring and quality assurance programs and procedures been in place, in reasonable medical probability Dr. Ugorji's obvious incompetence to timely recognize and correct an improper intubation and properly administer glucose would have been determined and he would have either been removed or trained so that he could competently perform the above procedures and make the appropriate determinations about the care needed by Marcella Guerra and her injury in reasonable medical probability would have been prevented.

Dr. Ugorji's incompetence to timely recognize and correct an improper intubation is evidenced in the medical records, the deposition of Dr. Cooper, the deposition of Dr. Weihl and in glaring form in Dr. Ugorji's own testimony insisting that he had not performed an esophageal intubation or other improper intubation on Marcella Guerra, despite clear evidence in a chest x-ray and other indications in the medical records of physical manifestations that he and/or his supervisee had in fact first performed an esophageal intubation and second an intubation in the right mainstem bronchus depriving Marcella Guerra's brain of vital oxygen and causing permanent, devastating and irreversible injury to her brain. Dr. Ugorji's incompetence to determine Marcella Guerra's need for immediate glucose

administration and monitoring is also evidenced in the medical records, which indicate that no glucose was ordered until midnight and Dr. Ugorji allowed Marcella Guerra's glucose level to drop to 5.

In preparation for this supplement of my September 11, 2005 120–day report, I have reviewed the following materials in addition to those listed in the September 11, 2005 120–day report: the contract between EHSA and EmCare, OP, L.P., the contract between EmCare, Inc. and EmCare, OP, L.P., the Articles of Association of EHSA, the expert report of Ms. Adrienne Bond, the depositions of Dr. Dighton Packard, Dr. Clement Ugorji, Dr. Cooper and Dr. Weihl.

I have formed the above opinions and conclusions based upon the information reviewed and based upon my knowledge and experience as a licensed and practicing medical doctor and director of emergency rooms. The opinions expressed herein are based upon reasonable medical probability.

Concerning Dr. Packard, the portions of Dr. Garlisi's supplemental report as to him included the following. Again, we have added the bolded information in brackets:

1. Although Dr. Packard was not physically present in the emergency room on November 2, 1998, he was responsible for ensuring that the care provided to Marcella Guerra by Dr. Ugorji on that date met the standard of care. On November 2, 1998, Dr. Packard was a[sic] not only a practicing physician, but the Chief Medical officer of EmCare, Inc. on that date. Dr. Packard also had a contractual right of control over EHSA for the benefit of himself and EmCare, Inc. in the event of Dr. Riggs' incompetence or other defined events....Dr. Dighton

Packard, as the Chief medical officer of EmCare, Inc., and as an interest holder who had a contractual right of control over EHSA in the event of Dr. Riggs' incompetence and/or other contractually defined events, was responsible for ensuring that the medical care provided to Marcella Guerra met the standard of care. It did not. Therefore, Dr. Packard is responsible for the injury to Marcella Guerra just as if he had been providing the care himself as set forth in detail in my September 11, 2005 120–day report and in further detail and clarification below.

Dr. Packard is responsible for Dr. Ugorji's breach of the standard of care and resulting injury to Marcella Guerra for failure to implement quality control procedures and programs that would in reasonable medical probability have prevented the injury to Marcella Guerra. **[Standard of care.]** As the Chief Medical Officer of EmCare, Inc., an entity that controlled EHSA, an entity whose sole purpose was to practice medicine, Dr. Packard had a duty to ensure that any physician practicing medicine as Dr. Packard's, Dr. Riggs', EmCare, Inc.'s and/or EHSA's agent through the Polly Ryon Memorial Hospital Emergency Department did so consistent with the standard of care.... This duty required Dr. Packard, either personally or through an agent, to provide on-site supervision and management of physicians, including Dr. Ugorji, who provided medical care through the Polly Ryon Memorial Hospital Emergency Department, to ensure that such physicians, including Dr. Ugorji, had the requisite skills, as well as competency in performing those skills, to provide the medical procedures and services needed by patients coming to the Polly Ryon Memorial Hospital Emergency Department for medical care. This duty also required Dr. Packard, either personally or through an agent, to develop and implement quality control procedures and programs to monitor competency and continued competency and provide continued training to physicians, including Dr. Ugorji, who were providing medical care through the Polly Ryon Memorial Hospital Emergency Department.....

3. Dr. Packard is also responsible for the brain injury to Marcella Guerra caused by the medical care provided to her by Dr. Ugorji in breach of the standard of care on the following basis. Under the terms of the contract between Polly Ryon Memorial Hospital and EHSA, and the "Management Services Agreement By and Between EmCare, OP, L.P. and EHSA," Dr. Packard, as a contractual interest holder in EHSA and as the Chief medical officer of EmCare, Inc., an entity that controlled EHSA, had an obligation to "confirm," either personally or through an agent, that Dr. Ugorji "assessed every patient who presented to the Emergency Department for treatment by and Emergency Physician to ensure that the immediate medical needs of such patient were not jeopardized" and "treated patients consistently with the facilities available and the standards established in the medical community of which the Hospital is a part."....

[Breach.] Dr. Riggs and Dr Ugorji testified that none of these responsibilities were met. Dr. Packard, as Chief Medical Officer of EmCare, Inc., an entity that controlled EHSA, was responsible for developing, implementing and supervising the above programs, claimed ignorance about

EHSA and Polly Ron Hospital—a clear disregard of his responsibilities. There was no on-site medical director from EHSA or any EmCare entity monitoring or supervising Dr. Ugorji's competency. There was also no quality assurance program in place or implemented by EHSA or EmCare at Pol[l]y Ryon Memorial Hospital to monitor and supervise Dr. Ugorji in the above procedures. [Causation.] Had the above supervision, monitoring and quality assurance programs and procedures been in place, in reasonable medical probability Dr. Ugorji's obvious incompetence to timely recognize and correct an improper intubation and properly administer glucose would have been determined and he would have either been removed or trained so that he could competently perform the above procedures and make the appropriate determinations about the care needed by Marcella Guerra. As a result, Marcella Guerra's injury in reasonable medical probability would have been prevented. . . .

Concerning Dr. Riggs, Dr. Garlisi explained the parameters of Dr. Riggs' responsibility as follows:

1. Although Dr. Riggs was not physically present in the emergency room on November 2, 1998, he is directly responsible for the care provided to Marcella Guerra by Dr. Ugorji on that date. As set forth in its Articles of Association, Emergency Health Services Associates (hereinafter "EHSA") was formed for the sole purpose of "engaging in the practice [of] medicine." . . . Dr. Ugorji provided medical care in the Polly Ryon Memorial Hospital emergency department to Marcella Guerra on November 2, 1998 as the agent of EHSA. The provision of medical care is a non-depletable duty.

Therefore, Dr. Leonard M. Riggs, as the 100% shareholder of EHSA, the principal physician, the sole officer and sole member of its board of directors, was directly responsible for the medical care provided to Marcella Guerra, including any breach of the standard of care and resulting injury, just as if he had been in the emergency room providing the care himself. The provision of that medical care was his direct responsibility and it was provided in breach of the standard of care to the injury of Marcella Guerra as set forth in my September 11, 2005 120–day report.

Most of the contents of the expert reports for Drs. Riggs and Packard on the standard of care, breach of the standard of care, and causation is substantively the same.

## D. The Complaints Regarding the Expert Reports Do Not Show an Abuse of Discretion.

### 1. We Review the Expert Reports Together to Determine Their Sufficiency.

The EmCare Entities first claim that each expert report must meet all of the requirements of an expert report. As noted above, after the Guerras' initial expert reports were found to be insufficient, they served supplemental reports on appellants. Appellants contend the supplemental reports did not constitute a good-faith attempt to comply with the requirements of section 74.351(r), because (1) the re-filed initial reports of Dr. Cooper and Garlisi, which the trial court found were deficient, could not have cured their own deficiencies and so should not have been considered by the trial court; (2) Dr. Weihl's report, which mentions only the conduct of Dr. Ugorji and does not mention any of the appellants by name, does not constitute an expert report as to appellants because it does not address their actions; (3) attor-

ney Adrienne Bond is unqualified to tender an expert report and her report does not explain the standard of care; and (4) Dr. Garlisi's supplemental report, the only one that should have been considered at all, does not cure the deficiencies of the original reports because his opinions are based on legal conclusions drawn from his review of Bond's report, and Dr. Garlisi is not qualified to render legal opinions concerning appellants' contractual duties or evaluate the legal opinions of others.

The Guerras respond that it is improper to consider each of the reports individually to determine sufficiency; rather, they argue, in assessing the sufficiency of the reports, we consider them as a whole. The Guerras point to the following provision of Chapter 74:

> Notwithstanding any other provision of this section, a claimant may satisfy any requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

TEX. CIV. PRAC. & REM. CODE § 74.351(i). The Guerras also cite *Martin v. Abilene Reg'l Med. Ctr.*, No. 11–04–00303–CV, 2006 WL 241509, at *4 (Tex. App.-Eastland 2006, no pet) (mem. op.), in which the court held that, to the extent the trial court may have reviewed a physician's report in isolation, the trial court abused its discretion because section 74.351(i) "expressly provides that a claimant may satis-

fy any requirement of the Act by providing reports of separate experts."

■ We agree that section 74.351(i) does not require that a single expert address all liability and causation issues with respect to a defendant. Thus, we may consider the Guerras' expert reports in the aggregate to determine whether the trial court abused its discretion when it determined that the Guerras' submitted expert reports constituted an objective good faith effort to comply with the definition of an expert report in section (r)(6). *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*).

**2. The Complaints Concerning Dr. Cooper's and Dr. Garlisi's Initial Reports Refiled.**

As noted above, the trial court found Drs. Cooper's and Garlisi's initial reports deficient because they were conclusory. Specifically, the trial court's order reflected that the court found as follows:

> The expert reports of Drs. Cooper and Garlisi, tendered by plaintiffs with respect to their claims against Dr. Packard and Riggs, are hereby found to be deficient, but good faith efforts to comply with Section 74.351. Specifically, the Court finds the reports to be conclusory with respect to any actual actions that these Doctors took, but should not have taken; or failed to take, when they should have done so. Additionally, Dr. Garlisi's report seems to assume that these individuals' duties as set forth in the contract documents he reviewed defines the standard of care relating to the medical care that was provided to the minor plaintiff, Marcela Guerra. The Court cannot make this assumption from the four corners of the report, absent expert testimony expressly stating the standard of care that applies. *See, e.g., Battaglia v. Alexander,* 177 S.W.3d 893, 899–900 (Tex.2005).[12]

---

12. Dr. Packard and the EmCare Entities suggest that the trial court must have intended to

cite *American Transitional Care Ctrs., Inc. v.*

a. Dr. Cooper's and Dr. Garlisi's reports should not be viewed in a vacuum.

■ On appeal, Dr. Packard and the EmCare Entities complain that Dr. Cooper's report does not explain how each individual appellant breached the standard of care, and does not provide a causal nexus between each appellant's alleged malpractice and the Guerras' damages. According to these appellants, the trial court abused its discretion when it accepted the same report after initially ruling it was insufficient. In a similar vein, Dr. Riggs contends that neither Dr. Cooper's initial report nor Dr. Garlisi's initial report may be considered because they were determined to be deficient and thus do not constitute expert reports.

We perceive these arguments to require us to review Dr. Cooper's and Dr. Garlisi's reports in isolation, rather than in conjunction with the other reports. As previously noted, section 74.351(i) permits a claimant to satisfy any requirement of section 74.351 for serving an expert report by serving reports of separate experts. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(i). If a plaintiff can rely on more than one report to satisfy the standard of care, breach, and causation, we see no violation of section 74.351(i) just because a plaintiff attempted to cure an insufficient report with supplemental reports and refiled expert reports some of which initially were found to be insufficient.

b. When read as a whole, the reports address each of the defendants separately.

Dr. Packard and the EmCare Entities also cite several cases for the proposition that a single expert report may not assert that multiple defendants are collectively negligent for failing to meet the standard of care. *See, e.g., Taylor v. Christus*

*Spohn Health Sys. Corp.,* 169 S.W.3d 241 (Tex.App.-Corpus Christi 2004, no pet.); *Doades v. Syed,* 94 S.W.3d 664 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718 (Tex.App.-Houston [14th Dist.] 2001, no pet.). However, these cases are distinguishable from the present case, in which the focus is on the duties and responsibilities of the EmCare Entities and Dr. Packard and Dr. Riggs as officers, directors, and/or employees of the EmCare Entities. When Dr. Cooper's report is read in conjunction with Dr. Garlisi's reports, any complaint that the individual appellant is not specifically named is cured.

c. The reports are not defective simply because they state that appellants each had the same duties.

As discussed further below, the Guerras' experts opine that these appellants had the same or similar duties in this context. Thus, to the extent appellants contend the Guerras' expert reports must fail because they assign the same duties and obligations as to each of them, we reject this contention. *See In re Stacy K. Boone,* 223 S.W.3d 398, 405–06 (Tex.App.-Amarillo 2006, orig. proceeding) (holding expert report was adequate on standard of care for multiple defendants when each defendant was involved in same type of care and expert explained that standard was the same for each).

**2. The Complaints Concerning Dr. Weihl's Report.**

Appellants complain that Dr. Weihl's report does not mention any of the appellants by name or sufficiently address the applicable standard of care, breach of the standard of care, or causation as to each appellant. Consequently, they urge that it does not represent a good faith effort to

---

*Palacios,* 46 S.W.3d 873, 878 (Tex.2001), in which the Texas Supreme Court held that the court look no further than the four corners of

the report itself to determine the sufficient of the report.

comply with the statutory definition of an expert report and so should not have been considered by the trial court. However, we disagree.

Dr. Weihl's report addresses causation and the requisites of a quality assurance program consistent with the standard of care, and compliments Dr. Garlisi's reports as to each defendant on these issues. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(i); *In re Stacy K. Boone*, 223 S.W.3d at 405–06. We reject appellants' claim that the trial court should not have considered Dr. Weihl's expert report.

### 3. Attorney Adrienne Bond's Expert Report.

We turn now to Adrienne Bond's expert report. For several reasons, appellants contend the trial court abused its discretion by considering and relying upon Bond's report.[13] Chief among them, appellants emphasize that Bond is an attor- ney, not a physician or healthcare provid- er, and so she is not an expert qualified to tender an expert report against a physi- cian or health care provider. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(A)-(C); *see also id.* § 74.401(a) (qualifications of expert wit- ness in suit against physician); § 74.402(b) (qualifications of expert witness in suit against health care provider). Although sections 74.401(d) and 74.402(d) provide for exceptions that appear to allow experts other than doctors and health care provid- ers to give expert testimony, appellants claim these sections are available only at trial.

a. The trial court relied on sections 74.401(d) and 74.402(d) as authority to ad- mit Bond's Report.

The trial court did rely on sections 74.401(d) and 74.402(d) of the Medical Lia- bility Act in determining that it would consider Adrienne Bond's report.[14] As we

---

**13.** Although each of the appellants do not raise each issue we address in this section, for purposes of clarity, we ill nonetheless refer to the points as having been raised by all of the appellants.

**14.** Section 74.401 of the Medical Liability Act provides as follows:

§ 74.401. Qualifications of Expert Witness in Suit Against Physician

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physi- cian who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treat- ment of the illness, injury, or condition in- volved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regard- ing those accepted standards of medical care.

(b) For the purpose of this section, "prac- ticing medicine" or "medical practice" in- cludes, but is not limited to, training residents or students at an accredited school of medi- cine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(c) In determining whether a witness is qualified on the basis of training or experi- ence, the court shall consider whether, at the time the claim arose or at the time the testi- mony is given, the witness:

(1) is board certified or has other substan- tial training or experience in an area of medi- cal practice relevant to the claim; and

(2) is actively practicing medicine in ren- dering medical care services relevant to the claim.

(d) The court shall apply the criteria speci- fied in Subsections (a), (b), and (c) in deter- mining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

noted, these two sections do provide for a limited exception to the statutory requirements relied on by appellants. Section 74.041(d) provides that in a suit against a physician:

> The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, *but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony.* The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

TEX. CIV. PRAC. & REM. CODE § 74.401(d) (emphasis added). Section 74.402(d) contains similar language applied to suits against health care providers. *See id.* § 74.402(d). The trial court relied on these provisions in finding good reason to admit Bond's testimony.

In the trial court's June 14, 2006 order denying Dr. Rigg's motion to dismiss, it expressly cited to sections 74.401(d) and 74.402(d), and then stated the following:

> The Court finds good cause to permit plaintiffs to file, and for their expert report physicians to rely upon, the report of Adrienne R. Bond, a non-physician expert in legal and corporate contracts. Specifically, the Court finds that the contractual and corporate inter-relationships of the various defendants, including specifically Dr. Leonard Riggs and several of the corporate defendants, render such an expert report helpful (if not absolutely necessary) to demonstrating the duties owed and to assisting the physician experts in their presentations of the applicable standards of care. Such corporate and legal testimony would not be within the experience of a typical physician otherwise qualified to render a report in this case.

(e) A pretrial objection to the qualifications of a witness under this section must be made not later than the later of the 21st day after the date the objecting party receives a copy of the witness's curriculum vitae or the 21st day after the date of the witness's deposition. If circumstances arise after the date on which the objection must be made that could not have been reasonably anticipated by a party before that date and that the party believes in good faith provide a basis for an objection to a witness's qualifications, and if an objection was not made previously, this subsection does not prevent the party from making an objection as soon as practicable under the circumstances. The court shall conduct a hearing to determine whether the witness is qualified as soon as practicable after the filing of an objection and, if possible, before trial. If the objecting party is unable to object in time for the hearing to be conducted before the trial, the hearing shall be conducted outside the presence of the jury. This subsection does not prevent a party from examining or cross-examining a witness at trial about the witness's qualifications.

(f) This section does not prevent a physician who is a defendant from qualifying as an expert.

(g) In this subchapter, "physician" means a person who is:

(1) licensed to practice medicine in one or more states in the United States; or

(2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship between the alleged departure from that standard of care and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE § 74.401. Section 74.402, the section governing the qualifications of an expert witness in a suit against a health care provider, is substantively identical to section 74.401 except that it applies to health care providers.

Similarly, in denying Dr. Packard and the EmCare Entities' motion to dismiss, the trial court stated the following:

> In so ruling, the Court considered and relied upon the non-medical expert report of Adrienne R. Bond, for the good cause stated in the Court's Order, of June 14, 2006, denying Dr. Leonard Riggs' Motion to Dismiss. See TEX. CIV. PRAC. & REM. CODE Sections 74.401(d) and 74.402(d). The Court did not consider nor rely upon the Bond report for any issue pertaining to medical causation.

b.  Sections 74.401(d) and 74.402(d) are not limited to experts at trial.

We consider first the claim that the trial court should not have relied on sections 74.401(d) and 74.402(d) because these sections apply only at trial. Appellants claim this because the section uses the word "testimony" to describe the information the expert presents to the court. For several reasons, we do not read sections 74.401(d) and 74.402(d) so narrowly.

First, testimony is not a phenomena reserved only for trial. Testimony is often given pre-trial in summary judgments in the form of depositions. It is presented to the court pre-trial in the form of affidavits. And, the expert reports themselves, given pursuant to 74.351, are akin to testimony, yet they are given pre-trial. In fact, section 74.351, which governs expert reports, defines an "expert" in the context of expert reports as a "person giving opinion testimony regarding whether a physician departed from accepted standards of medical care...." See TEX. CIV. PRAC. &

REM. CODE § 74.351(r)(5)(A); see also id. § 74.351(r)(5)(B).

Second, the plain language of the Medical Liability Act does not limit the two sections to trial. To start narrowly, the headings of sections 74.401 and 74.402 are entitled, "Qualifications of an Expert Witness in Suit Against a [Physician/Health Care Provider]"; they do not limit the sections to experts testifying at trial. Even more obviously, sections 74.401(f) and 74.402(f) discuss pre-trial objections to the qualifications of an expert witness, making it appear that the sections cover the whole spectrum of expert witnesses in a health care liability suit from pre-trial to trial. Another section in the Act also suggests a broader interpretation. Subsection 74.351(r)—which contains the definitions for section 74.351, entitled "Expert Reports"—defines an expert who is qualified to give an expert report (pre-trial) as one who is qualified to testify under sections 74.401 and 74.402. See TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(A)-(B).[15] It does not limit the qualifications to 74.401(a)-(c) and 74.402(a)-(c)—those sections referring specifically to physicians and health care providers. It includes all of sections 74.401 and 74.402, including the exceptions contained in 74.401(d) and 74.402(d). Thus, an expert report, which is filed only 120 days after suit and will before trial, includes the report of an expert described in the "good cause" exception of sections 74.401(d) and 74.402(d). This plain language also does not seem to support a presumption that the good cause exceptions contained in sections 74.401(d) and 74.402(d) apply only at trial.

---

15. The relevant portions of section 74.351(r)(5) define "expert" to mean "(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401" and "(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402." See TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(A)-(B).

Finally, a third reason exists for not adopting appellants' position. Their position would create an expert report "Catch-22" for plaintiffs litigating against corporate/business health care entities that have complex or layered corporate structures or relationships.

The Guerras sued a number of entities. At one point in time, seven related entities were sued—Emergency Health Services Associates ("EHSA"), EmCare, Inc., EmCare Holdings, Inc., EmCare O.P., L.P., EmCare (a registered trademark), EmCare of Texas, Inc., and Emergency Medical Services, L.P.—and two individuals, Drs. Riggs and Packard, who held various corporate capacities, such as officers, directors, members, shareholders, or employees, in these companies.

When Adrienne Bond was asked to prepare her report, each of these companies was still a defendant in the case. Yet the report she gave to the court opined only on three of the companies—EmCare, Inc., EmCare Holdings, Inc., and EHSA—and the two individual doctors connected with the companies, Drs. Riggs and Packard. In her expert report, Bond "connected the dots" between the companies and Drs. Riggs and Packard for Drs. Cooper, Weihl, and Garlisi. She acquired this level of knowledge based on reviewing the following documents, among others:

- the articles of association of EHSA;
- the corporate structures, contracts, and board of directors' meetings of EmCare Holdings, Inc., Emcare, Inc., and EHSA;
- the corporate records of EHSA;
- the Management Services Agreement between EmCare and EHSA;
- the Succession Agreement among EHSA and Drs. Riggs, Packard, and Cooley;
- the Stock Transfer and Option Agreement between EmCare, Inc. and Riggs;

- filings of EmCare Holdings, Inc. and EmCare, Inc. with the Securities and Exchange Commission;
- the Exclusive Management Agreement between Polly Ryon Hospital and EHSA;
- financial documents such as banking records and loans for each entity; and
- Dr. Ugorji's employment file.

Bond's corporate expertise enabled her to present a much sharper and more accurate picture of the relationships that matter in this suit.

Few, if any, doctors would be qualified to examine the records Bond reviewed and acquire the same depth of knowledge or clarity. Few, if any, doctors would be able to focus in so sharply on the relationships they claim are important. Yet, this was the expertise that was required to winnow the unnecessary parties from the necessary parties and to connect the dots among the corporate and individual responsibilities.

If Bond were not allowed to "connect the dots" between each entity (and individual) and its (or their) responsibility for training programs or management of emergency rooms, Drs. Garlisi, Weihl, and Cooper would not be able to prepare a sufficient report for each entity (and individual). In fact, initially, Cooper and Garlisi were unable and/or unqualified to "connect the dots" and the trial court found their reports insufficient. But with Adrienne Bond's report explaining the "contractual and corporate inter-relationships of the various defendants" along with their duties to each other and to Polly Ryon Memorial Hospital, Dr. Cooper's, Dr. Weihl's, and Dr. Garlisi's new reports sufficiently explained each of the defendant's standard of care, breach, and causation. Adrienne Bond's report connected the dots for the physicians.

For these reasons, we hold that sections 74.401(d) and 74.402(d) are available for use at the expert report phase of a health care liability claim.

c. The trial court property applied sections 74.401 and 74.402.

Next, appellants claim that the trial court was required to apply the criteria of sections 74.401(a)-(c) and 74.402(a)-(c) on the record before finding "good cause" to admit Ms. Bond's report. They rely on section sections 74.401(d) and 74.402(d) in making this claim. These sections do require the trial judge to put certain information on the record. Specifically, these sections require the trial judge to state on the record the reason for resorting to the good cause exception. The trial court here did just that. We can find no language in sections 74.401(d) and 74.402(d) that supports appellants' claim. In any event, for all practical purposes, a judge must apply the criteria of sections 74.401(a)-(c) and 74.402(a)-(c) and find them lacking before he can conclude that he must resort to the "good cause" exception.

d. The trial court did not improperly peer outside the four corners of an expert report and rely on extrinsic data.

Appellants also claim that, by considering Bond's report, the trial court was not merely jointly reading one or more expert reports in order to have an understanding of the standard of care and proximate causation in the context of the plaintiffs' allegations, which presumably they concede is appropriate under 74.351(i). Instead, appellants claim the trial court did what the Texas Supreme Court told it not to do in *Battaglia*, 177 S.W.3d at 899— peer outside the four corners of an expert report and rely on extrinsic data to find the standard of care and causation. We disagree that the trial judge took steps contrary to either *Battaglia* or *Palacios*, 46 S.W.3d at 878.

In *Battaglia*, the plaintiffs advocated that the contract between the hospital and Battaglia's professional corporation set the applicable standard of care and was evidence of the applicable standard of care for a health care liability claim. *Battaglia*, 177 S.W.3d at 899. The Supreme Court disagreed, holding that "[t]he standard of care in this case, as in most health care liability cases, must be established by competent expert testimony." *Id.*

*Palacios*—the case in which the Court used the phrase "the four corners" of the report and in which the Court established the standards for reviewing an expert report—also does not support appellants' claim that the doctors could not refer to Bond's report. *See Palacios*, 46 S.W.3d at 878. The Court referred to the "four corners" because of a dispute between the parties in that case on how the court must determine a report's adequacy. The defendant claimed the court should engage in a two-step process: (1) determine if the report is a fair summary of the expert's opinions, and (2) if the report is not a fair summary, look outside the report at the plaintiff's conduct to determine if the plaintiff made a good faith effort to meet the statutory requirements. *Id.* The plaintiffs argued "that the statute requires only one inquiry—whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions." *Id.* "According to the [plaintiffs], the trial court does not have to make any factual determinations because the only relevant information is in the report itself." *Id.* The Court agreed with the plaintiffs, and thus held that the plaintiffs' efforts to meet the statutory requirements was not a relevant inquiry when considering the adequacy of an expert report. *Id.* Clearly, this type of evidence does not establish or assist in establishing the three elements of a satisfactory report—standard of care, breach, and causation. *See id.*

Here, the Guerras have not relied on facts or information irrelevant to the expert report. This court and the trial court agree that Bond's report assisted the medical experts in addressing the standard of care, breach, and causation for each entity and individual. So, unlike *Battaglia* and *Palacios*, in which the defendants wanted the court to consider facts that did nothing to aid in assessing the adequacy of a report, here we are considering facts relevant to the standard of standard of care, breach, and causation, given by an expert recognized under sections 74.401(d) and 74.402(d), and placed in a report recognized as an expert report in section 74.351(r)(5)(A)-(B). Although these facts themselves do not establish the standard of care, breach, and causation, they enabled the medical experts to set the standard of care, breach, and causation for appellants. Because Bond's report is no different from the expert reports of the doctors, they—and we—may refer to and rely on the Bond report.

For these reasons, Adrienne Bond's report does not violate either *Battaglia*'s or *Palacios*'s proscription against going outside the four corners of an expert report to rely on extrinsic data.

e. Bond's report did not improperly provide opinions about issues of law that are the sole province of the court.

Finally, appellants claim that Bond's report usurped the judge's role by providing opinions about issues of law that are the sole province of the court. Again, we disagree for several reasons.

First, an expert is allowed to opine on issues involving technical or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact at issue in a case. TEX. R. EVID. 702. This is precisely what Adrienne Bond's opinion testimony did. It explained the various inter-relationships with, and responsibilities to, Polly Ryon

Memorial Hospital. As we said earlier, it connected the dots. A fact finder would need to know this information before deciding whether to impose liability based on the standard of care, breach, and causation testimony (just as the doctors, who were not experts in corporate law, needed this information before opining).

Appellants refer us to two cases in which courts did not allow testimony of an expert because it encroached on the court's role; however, neither is relevant. In the first case, expert testimony was struck because an expert offered to give his interpretation of the terms of an unambiguous lease. *See Akin v. Santa Clara Land Co., Ltd.*, 34 S.W.3d 334, 339 (Tex. App.-San Antonio 2000, pet. denied). In the second, the court of appeals held that the trial court did not abuse its discretion in excluding from the bench trial testimony as to whether the evidence contained the legal elements required to establish an implied easement, an easement by estoppel, or a public dedication. *See Holden v. Weidenfeller*, 929 S.W.2d 124, 133–34 (Tex. App.-San Antonio 1996, writ denied). In contrast to these cases, this trial court held that Adrienne Bond's report was useful both for him and for the doctors. In this case, this decision was not an abuse of discretion.

Second, and more importantly, none of the reports, including Bond's, is anything more than a preliminary showing that the plaintiffs have a viable claim that is not frivolous or without support of experts. No ultimate conclusions have been made, no liability has been set, no decisions on issues of law have been made. These issues are for trial. At this stage of the proceeding, the requirement of a sufficient expert report is simply to: (1) inform the defendant of the specific conduct that is being called into question, and (2) provide a basis for the trial court to conclude that

the plaintiff's claims have merit. *Palacios*, 46 S.W.3d at 879.

#### 4. Dr. Garlisi's Supplemental Report.

##### a. Appellants' complaints generally.

Next, appellants contend that the trial court should have considered only Dr. Garlisi's supplemental report in determining whether the Guerras cured the deficiencies of the original reports and satisfied the statutory requirements of the Act, but contend that it too is insufficient and so fails to cure the insufficiencies of the initial reports. As previously noted, the trial court found the Guerras' initial expert reports of Dr. Cooper and Dr. Garlisi to be deficient, but good faith efforts to comply with section 74.351; the court found that they were conclusory with respect to the doctors' actions and inactions. Additionally, the trial court found that Dr. Garlisi's report seemed to assume that the contract documents defined the standard of care relating to the medical care provided to Marcela Guerra.

Appellants complain that Dr. Garlisi's opinions concerning the standard of care, breach, and causation are conclusory as to each of them individually, and do not distinguish between the physicians, who were not present when Dr. Ugorji treated Marcela, and the EmCare entities.[16] Appellants also contend that Dr. Garlisi, an expert in the area of emergency medicine and internal medicine, is not qualified to render legal opinions or evaluate the legal opinions of others, such as Bond, or to interpret contracts. Finally, they contend he does not show that he has any expertise in the area of staffing, healthcare business services, or any other services allegedly provided relevant to this lawsuit.

##### b. Dr. Garlisi's supplemental report, when read with the other reports, is sufficiently specific.

We disagree with appellants. We find Dr. Garlisi's report on these issues, read in conjunction with his initial reports and the reports of Dr. Cooper, Dr. Weihl, and Bond, sufficiently specific to notify appellants of the claims against them and to provide a basis for the trial court to conclude that the Guerras's claims have merit. *See Palacios*, 46 S.W.3d at 879. We have previously addressed many of appellants' complaints in the preceding sections and those arguments apply equally here.

We add in response to appellants' repeated contentions that the reports must fail because they "collectively" address the standard of care, breach, and causation, the Texas Supreme Court rejected this premise in *Battaglia*, where plaintiffs alleged that physicians and their professional associations were all negligent in providing professional services in "precisely the same respects." *See Battaglia*, 177 S.W.3d at 901. There, the Court stated:

> It is possible to imagine, in the abstract, that a physician in such circumstances could wear two hats. While a professional association with a single principal can act only through that person, the person can act outside the scope of his employment as principal of the association. But that did not happen here. Each professional association and its physician-principal acted as one in providing professional services. Neither the pleadings nor the evidence furnished any basis for drawing distinctions between the physicians and their respective professional associations, and the

---

**16.** Appellants also contend that the trial court abused its discretion when it permitted Dr. Garlisi to base his opinions on Bond's report and contracts not attached to the report, as Bond's opinions and the contract documents were not within the four corners of Dr. Garlisi's report. We have addressed this complaint *supra* under our discussion of Adrienne Bond's report.

trial court should not have permitted such distinctions. Each professional association had direct liability for the actions of its physician-principal in the course of his employment, and vicarious liability for the actions of its agents and employees in the course of their employment. If the physicians were negligent, the professional associations were likewise negligent, since each association acted only through its physician-principal.

*Id.* at 901–02 (internal omitted).

Thus, in the universe of the Guerras' pleadings and the expert reports before it, we cannot say the trial court abused its discretion in determining that the Guerras' expert reports, taken together, satisfied the requirements of section 74.351.

c. Dr. Garlisi is qualified to opine on the matters he addresses.

Finally, we address appellants' contentions that Dr. Garlisi is not qualified to opine on legal or contractual issues, or to evaluate the legal and contractual opinions of others, and that he has no expertise in the areas of staffing, management, or related administrative or professional services.

In his supplemental reports, Dr. Garlisi summarizes his credentials as follows:

I am a Board–Certified physician in Emergency Medicine and Internal Medicine. I am also certified in Advanced Trauma Life Support and Advanced Pediatric Life Support. I am licensed to practice medicine in the States of Indiana and Ohio. I am currently practicing emergency medicine in Ohio. I was the Director of the Emergency Room at St Anthony's Hospital and had a clinical and hospital based practice at the time of this incident in 1998.

Specific to the relevant issue, in his initial reports, Dr. Garlisi states the following:

I have over 20 years of experience as an emergency room physician and over ten years of experience as a director of hospital emergency rooms. My experience as a hospital emergency room director has included the review, analysis, and implementation of contractual relations with other physicians and entities for the provision of emergency room services, along with the attendant duties with respect to the various persons and entities involved in providing emergency room medica care and management.

We conclude that Dr. Garlisi is qualified to opine on the standard of care, breach, and causation in this case. The Guerras have alleged corporate malfeasance directly and vicariously arising from appellants' actions and failures to act as required under their contractual obligations and any related medical obligations. As the trial court recognized, there would be few professionals that would satisfy the requirements as appellants have drawn them. Dr. Garlisi is well qualified to address the medical aspects of emergency room procedures, and his experience as an emergency room director for over ten years, which has included "the review, analysis, and implementation of contractual relations with other physicians and entities for the provision of emergency room services," is sufficient to render him qualified to provide the foregoing opinions. And, it is likely that if the Guerras provided a hospital administrator or person in a similar position, appellants would just as strenuously complain that such persons were unqualified because they were not physicians with experience in working in and directing the operation of hospital emergency rooms. We therefore reject appellants' contention that Dr. Garlisi is unqualified to opine on the standard of care, breach, or causation in this case.

d. Dr. Garlisi justifiably relied on Bond's report.

Finally, appellants complain again that Garlisi relied on Bond to establish the standard of care. Although we believe we have addressed this claim in preceding sections, we address it here one final time to ensure no misunderstanding. Adrienne Bond's report did not address the standard of care, breach, or causation—and it could not have properly discussed these topics because she is not a physician or health care provider. Instead, Adrienne Bond's report explained the legal relationships between and among appellants and between them and Dr. Ugorji and the hospital.

These legal relationships define and explain what appellants allegedly promised to do for the hospital (i.e., manage and staff its emergency room) and what role each had in fulfilling that promise. Adrienne Bond concluded that all of the appellants were legally responsible for managing and staffing the emergency room. Armed with this useful information, Garlisi and the other medical experts were able to apply their medical expertise to each appellant and explain (1) the standard of care for one who has agreed to manage and staff an emergency room, (2) how each appellant breached the standard of care, and (3) how the breach proximately caused the Guerras' injuries. Adrienne Bond, the legal expert, did not supply the standard of care; Dr. Garlisi and the other medical experts did.

In summary, having considered and overruled all of appellants' issues, we affirm the trial court's order.

Senior Justice EDELMAN concurring without opinion.