**Opinion filed June 11, 2009**



In The

# Eleventh Court of Appeals

———————

## No. 11-07-00274-CV

———————

**GAYLA DEWS, INDIVIDUALLY AND AS REPRESENTATIVE
OF THE ESTATE OF MARJORIE LENORE
BLACK DEWS, DECEASED, Appellant**

**V.**

**PALO PINTO NURSING CENTER, L.P. ET AL, Appellees**

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. C41283**

**M E M O R A N D U M   O P I N I O N**

Appellant Gayla Dews, individually and as representative of the estate of Marjorie Lenore Black Dews, deceased, brought this health care liability claim against Palo Pinto Nursing Center, L.P.; David B. Ramsey, M.D.; Alice L. Ramsey, M.D.; and Patrick W. Hisel, M.D. Marjorie Dews died on June 26, 2004, and the claim was filed on February 24, 2006. Dews alleged that the doctors

and the nursing home failed to timely and properly diagnose and treat gastrointestinal bleeding from a peptic ulcer suffered by her mother, Marjorie Dews, and that that failure proximately caused her mother's death on June 26, 2004.

In an attempt to comply with TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2008), Dews served appellees with the reports of William R. Gardner, M.D. and Frances Lovett, R.N. Appellees filed their respective objections to Dews's expert reports and motions to dismiss with prejudice. After a hearing on July 13, 2006, the trial court granted Palo Pinto Nursing Center's motion to dismiss with prejudice. The court stated in its letter ruling that "the report of Nurse Lovett [was] wholly insufficient (both substantively and as to her qualifications) to satisfy the requirements of the statutes." In that same December 19, 2006 letter ruling, the trial court found that Dr. Gardner's report was deficient as to the doctors but granted Dews a 30-day extension to file an amended report as to each individual physician. *See* Section 74.351(c).

Dews filed an amended report by Dr. Gardner and filed a motion for the court to reconsider its order dismissing Palo Pinto Nursing Center. On June 20, 2007, the trial court signed an order granting Palo Pinto Nursing Center's objections to the reports of Dr. Gardner and Nurse Lovett and dismissing Dews's claim against Palo Pinto Nursing Center with prejudice. The court also signed orders granting the doctors' motions to dismiss with prejudice. We affirm.

*The Texas Medical Liability Act*

In 2003, the Texas Legislature enacted the Texas Medical Liability Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 74 (Vernon 2005 & Supp. 2008). Section 74.351 requires a plaintiff asserting a health care liability claim to submit an expert report, along with the expert's curriculum vitae, as to each physician or health care provider named as a defendant in the suit, no later than the 120th day after filing suit. Section 74.351(r)(6) describes an expert report as a written report providing "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."

If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after

2

hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report" in Section 74.351(r)(6). Section 74.351(*l*). To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001); *Longino v. Crosswhite*, 183 S.W.3d 913, 916-17 (Tex. App.—Texarkana 2006, no pet.). A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Wright*, 79 S.W.3d at 52. In determining whether the report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the report. Section 74.351(r)(6); *Palacios*, 46 S.W.3d at 878.

*Standard of Review*

In her first issue, Dews raises the question of whether the standard of review of the trial court's rulings remains an abuse of discretion standard as the Texas Supreme Court held in *Palacios*, 46 S.W.3d at 875. *Palacios* and *Wright* dealt with TEX. REV. CIV. STAT. art. 4590i (1997) (repealed effective August 31, 2003), the predecessor statute to the Texas Medical Liability Act. We addressed the arguments in *Kendrick v. Garcia*, 171 S.W.3d 698, 702-03 (Tex. App.—Eastland 2005, pet. denied), where we held that this court will utilize the abuse of discretion standard set forth in *Palacios* when we review a trial court's ruling on a defendant's motion to dismiss under Section 74.351. We will continue to do so until there is authority to the contrary. The first issue is overruled.

An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Wright*, 79 S.W.3d at 52. A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). However, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

3

*Dr. Gardner's Report*

In her third and fourth issues, Dews contends that the trial court abused its discretion in ruling that the written expert report of Dr. Gardner was legally insufficient and erred in dismissing her health care liability claims against the appellees.

In his report, Dr. Gardner began by stating that he has substantial knowledge and experience in the diagnosis, care, assessment, and treatment of elderly patients with one or more bleeding ulcers and related complications, including anemia. Dr. Gardner described the standard of care that each of the three doctors should have followed when in charge of the treatment of Marjorie Dews: (1) each doctor should have immediately ordered a gastrointestinal consult; (2) each doctor should have required an "upper GI series"; and (3) each doctor should have recommended that Marjorie Dews refrain from taking Ecotrin/aspirin. All three doctors challenge Dr. Gardner's report on the ground that it did not describe with sufficient facts the causal relationship between his statement of their breaches of the standard of care and the death of Marjorie Dews. Dr. Gardner addressed the causation element as follows:

> It is clear from Ms. Dews' medical records that she had a painful and severe bleeding ulcer. Dr. David Ramsey, Dr. Alice Ramsey and Dr. Hisel each failed to appreciate the severity of the ulcer, and never diagnosed the cause or specific source of the bleed. If the above standards of care had been met by Dr. David Ramsey, Dr. Alice Ramsey and Dr. Hisel, the severity of Ms. Dews' bleeding ulcer, as well as the cause and specific source of the bleed, would, in reasonable medical probability, have been diagnosed. If the severity of the bleeding ulcer and cause and specific source of the bleed had been determined, the bleed, in reasonable medical probability, would have been slowed or stopped by surgery or medication. Death can, and often does, occur quickly after the onset of a bleeding ulcer due to excessive blood loss and related complications. If the bleed had been slowed or stopped before Ms. Dews' discharge from Palo Pinto General Hospital on June 24, 2004, Ms. Dews' death, in reasonable medical probability, would have been prevented. Additionally, bleeding ulcers are painful. If the bleed had been slowed or stopped before Ms. Dews' discharge from Palo Pinto General Hospital on June 24, 2004, in reasonable medical probability, Ms. Dews would not have suffered severe pain due to the bleed.

> It is my opinion that the above described failures of David B. Ramsey, M.D.; Alice L. Ramsey, M.D. and Patrick W. Hisel, M.D. to meet the reasonable, prudent and accepted standards of medical care for a family practice physician in the diagnosis, care and treatment of Ms. Dews was a probable cause of Ms. Dews' injuries, harm and death for the reasons described above. Also, I have considered the other potential or possible causes of injury, harm and death to Ms. Dews, and ruled them

4

out. My opinions in these regards are based upon my medical education, training, experience, research, writing, applicable reliable medical literature and other reasons set forth below.

Dr. Gardner does not describe how he reached his conclusion that the bleeding was severe or how the severity of the bleeding caused her death. His report does not contain facts documenting that Majorie Dews suffered from severe or excessive blood loss. Earlier in his report, Dr. Gardner stated that Dr. David Ramsey and Dr. Alice Ramsey documented the gastrointestinal bleed in the chart and that Marjorie Dews "underwent numerous transfusions" during her hospital admission. He also stated that Dr. Alice Ramsey noted the need to obtain a gastrointestinal consult if Majorie Dews "did not respond to the current treatment regimen." We are left to infer that Majorie Dews did or did not respond to the treatment; we do not know from Dr. Gardner's report.

In essence, Dr. Gardner concludes that the doctors' delay in obtaining a consult with a gastrointestinal specialist, delay in immediately ordering an upper GI series, and failure to recommend that Marjorie Dews refrain from taking Ecotrin/aspirin resulted in her death. We do not have an additional opinion by a gastrointestinal specialist that their delay caused her death. We can infer, but do not know, that an upper GI series would have determined the cause or specific source of the bleed, but then we do not know what steps the doctors should have taken. It is not clear who Dr. Gardner thinks should have slowed or stopped the bleeding. Dr. Gardner only states that, "[i]f the bleed had been slowed or stopped before Ms. Dews' discharge from Palo Pinto General Hospital on June 24, 2004, Ms. Dews' death, in reasonable medical probability, would have been prevented."

Dr. Gardner's report indicates that the bleeding from the ulcer caused her death, but there are no facts set forth to support that conclusion. Dr. Gardner indicated at the outset in his report that Marjorie Dews was an elderly patient with a bleeding ulcer and related complications, including anemia; however, we are not told what other health problems she suffered. Dr. Gardner simply states, "Also, I have considered the other potential or possible causes of injury, harm and death to Ms. Dews, and ruled them out." Dr. Gardner's report is similar to the report in *Barko v. Genzel*, 123 S.W.3d 457 (Tex. App.—Eastland 2003, no pet.), where we held the report was insufficient when the causal relationship was stated as "[t]hese violations of the standards of emergency medical practice were a proximate cause in this patient's injury." *Barko*, 123 S.W.3d at 460.

In *Longino*, 183 S.W.3d at 918, the court held that a similar expert report was legally insufficient because "[t]he report here only states that the delay in diagnosis caused significant and permanent neurological injuries. An expert report must show causation beyond mere conjecture." Dr. Gardner conjectures that Marjorie Dews's death would have been prevented if a gastrointestinal specialist had been consulted or if an upper GI series had been ordered. Those are mere conclusions concerning causation. Appellant's third and fourth issues are overruled.

In her second issue, Dews argues that the trial court abused its discretion in ruling that Nurse Lovett was not qualified as an expert to give an opinion regarding whether Palo Pinto Nursing Center departed from the accepted standards of health care. The trial court found that Nurse Lovett's report was legally insufficient and did not constitute a good-faith effort to comply with the statutory requirements concerning Dews's claim against Palo Pinto Nursing Center. After reviewing Nurse Lovett's report and curriculum vitae, we cannot say that the trial court abused its discretion in its ruling.

Palo Pinto Nursing Center first argues that Nurse Lovett was not qualified because neither her report nor her curriculum vitae indicated that she had experience regarding the specific condition at issue – the timely diagnosis of a peptic ulcer and/or gastrointestinal bleeding from a peptic ulcer. Palo Pinto Nursing Center also criticizes Nurse Lovett's report as being too general for it to know exactly what was the standard of care for its nurses and its administration and how that standard of care was breached. Nurse Lovett stated that Palo Pinto Nursing Center's registered nurses "should have used a systematic approach to provide individualized, goal directed nursing care" by "performing nursing assessments regarding the health status of Ms. Dews." Nurse Lovett stated that the nursing staff noted certain classic symptoms of gastrointestinal bleeding that required "a full assessment." But she did not state precisely what particular assessments were required, how frequently the particular assessments were required, or how Palo Pinto Nursing Center's nurses breached the standard of care. She did, however, point out specific nursing interventions that were not implemented:

> [R]egular, systematic blood pressure, temperature, pulse and respiration monitoring; and check for blood in stools for bowel movements recorded on 6-16-04 and 6-17-04. The nursing staff did not use the data they collected to provide a comprehensive assessment. In the absence of a comprehensive nursing assessment, interventions were delayed or absent. The nursing staff knew on 6-17-04 that Ms. Dews'

6

laboratory studies showed a critical drop in red blood cells to 2.37, a hemoglobin of 7.0 and a hematocrit of 21.1 The nurses knew or should have known this was an indication of blood loss requiring heightened assessment, reporting to Ms. Dews' physician and emergency interventions. This care was not provided to Ms. Dews.

Overall, Nurse Lovett's report was too broad for a determination of what the standard of care was for the nurses and administration of Palo Pinto Nursing Center or how that standard of care was breached.

Even if Nurse Lovett's report were to be considered as a good-faith attempt regarding the standard of care for the nurses and the administration, there was still no good-faith attempt to meet the causation requirement. Section 74.351(i) expressly provides that a claimant may satisfy any requirement of the Act by providing reports of separate experts. *See Packard v. Guerra*, 252 S.W.3d 511 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Martin v. Abilene Reg'l Med. Ctr.*, No. 11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.—Eastland Feb. 2, 2006, no pet.) (mem. op.). Nurse Lovett was not qualified to address the causal relationship between any failure by Palo Pinto Nursing Center and its nurses and the death of Marjorie Dews. *See Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 248 (Tex. App.—San Antonio 2004, no pet.) (holding that registered nurse was not qualified to express expert opinion as to cause of patient's death). For the causal relationship, Dews relied on the report of Dr. Gardner. For the reasons we discussed in regard to the actions of the doctors, Dr. Gardner's report was not legally sufficient in describing the causal relationship between the actions of the nurses and administration of Palo Pinto Nursing Center and the death of Majorie Dews. Appellant's second issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE

June 11, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

7