Opinion issued July 24, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-25-00055-CV

———————————————

**HOUSTON METHODIST ST. JOHN HOSPITAL D/B/A HOUSTON METHODIST CLEAR LAKE HOSPITAL, Appellant**

**V.**

**SHELBY SHIRRILL CAGLE, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-42246**

---

## MEMORANDUM OPINION

This appeal presents the questions of whether a suit is a health care liability claim and whether the plaintiff's expert report was adequate. Though the questions are familiar ones, the facts presented are unusual. While pregnant, Shelby Shirrill Cagle made an adoption plan for her unborn child. After her daughter was born,

Cagle changed her mind, but the hospital nevertheless released the newborn to the intended adoptive parents.[1]

Cagle sued appellee Houston Methodist St. John Hospital d/b/a Houston Methodist Clear Lake Hospital ("the hospital") alleging, among other things, that its employees ignored her when she told them she changed her mind and wanted to keep her child. She also alleged that the hospital gave her baby to people who had no legal right to possession. Cagle denied that her cause of action was a health care liability claim (HCLC), but she served an expert report written by a practicing family-law attorney. The hospital moved to dismiss Cagle's claims under the Texas Medical Liability Act, and the trial court denied the motion.

On appeal, the hospital argues that Cagle's claim is an HCLC and that the trial court abused its discretion by denying the motion to dismiss. We do not imagine that the Legislature contemplated a situation like the one presented here when it enacted or amended the Act. We conclude, however, that the language of the Act and the Supreme Court's precedents compel a conclusion that Cagle's claim is an HCLC alleging departures from standards for professional and administrative services.

---

[1] Acting pro se, Cagle successfully contested the parental termination suit brought by the intended adoptive parents and regained custody of her then 18-month-old child.

2

The Act requires the claimant to serve an expert report that allows the trial court to determine whether the claim is frivolous. We conclude that, in the unusual circumstances presented here, there is good reason to hold that the attorney-expert is a person with expertise for the purpose of the expert report. We conclude that the report contains the opinion of an individual with expertise that the claim has merit and implicates the hospital's conduct. Accordingly, we reverse the trial court's order denying the hospital's motion to dismiss, and we remand this case to the trial court to determine whether to grant Cagle a thirty-day extension to cure the deficient report.

## Background

Cagle was admitted to the hospital for reasons involving her pregnancy. She alleges that she signed an "affidavit of relinquish[ment]" that day, and she gave birth to her daughter the next day. According to Cagle, immediately before and after giving birth, she revoked her affidavit, and "demanded" that the hospital "not release her child" to the intended adoptive parents named in the affidavit. Cagle alleged that she communicated her change of mind to the nursing staff. The day after Cagle was discharged from the hospital, the hospital discharged the baby to the intended adoptive parents.

Cagle sued the hospital, alleging that the hospital negligently failed to follow its own policies, failed to train and supervise its staff, and caused her injuries,

3

namely deprivation of access to and possession of her child. Although she denied that her cause of action was an HCLC, she indicated that she would treat it as one until the court determined otherwise. Cagle served an expert report from Suzanne Schwab Radcliffe, a practicing attorney and former family court judge, who identified legal standards applicable to determining custody and possession of the child, identified what the hospital did, and opined about what it should have done. Her report was accompanied by a curriculum vitae.

The hospital objected to the expert report on the grounds that it was not an objective good faith effort to comply with the statutory requirements and Radcliffe was not an expert because, among other things, she was not practicing health care. Because Radcliffe was not an expert, the hospital argued that the report was not an expert report at all.

Cagle responded that her claim did not arise from medical treatment or health care and that expert medical or health care testimony was not necessary. She asserted that the hospital had not identified any medical treatment or health care services at issue, and she maintained that the Act did not apply to her cause of action. Finally, she argued that even if a report were required, her expert was qualified to offer an opinion, and the hospital did not identify any legal basis for requiring a particular kind of expert.

The hospital moved to dismiss arguing that Cagle's claims were HCLCs alleging departure from safety or professional or administrative standards directly relating to medical treatment or health care. The hospital identified statutes and hospital licensing regulations that, it maintained, were applicable to Cagle's cause of action. The hospital asserted that Cagle's claims "require expert medical testimony to establish the standard of care for a hospital and its staff providing postpartum and neonatal care to its patients, including the determination of who has superior rights of possession to a newborn and to whom a newborn should be released to upon discharge from its hospital." Finally, it argued that because Cagle failed to timely file a statutorily compliant expert report, the court was required to dismiss her claims.

At the hearing on the motion to dismiss, Cagle argued that if the court concluded her claims were HCLCs, an attorney was an appropriate expert because the issues center on legal requirements applicable to a hospital. The trial court denied the hospital's motion, and the hospital appealed.

**Analysis**

To determine whether the trial court abused its discretion by denying the motion to dismiss, we must consider whether (1) Cagle's claims are HCLCs, and (2) the Radcliffe report was adequate. In this case, the first and third prongs of the statutory definition of an HCLC are not in controversy. TEX. CIV. PRAC. & REM.

5

CODE § 74.001(a)(13) (providing in first prong that HCLC is cause of action against health care provider and in third prong that claimant alleges departure from accepted standards proximately caused her injuries). The hospital argues that Cagle's claims implicate health care, safety, and professional or administrative standards.

## I.     An HCLC claimant must timely file an expert report or risk dismissal for failure to do so.

Under the Act, an HCLC is

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(13).

If a cause of action is an HCLC, the Act requires the claimant "to serve one or more expert reports describing the applicable standards of care, how the defendant's conduct failed to meet those standards, and how those failures caused the claimant harm." *Collin Creek Assisted Living Ctr., Inc. v. Faber*, 671 S.W.3d 879, 885 (Tex. 2023) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a), (r)(6)). "This expert-report requirement enables trial courts to 'identify and eliminate frivolous [HCLC]s expeditiously, while preserving those of potential merit,' *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011), because any claim that

6

constitutes an HCLC is subject to dismissal with prejudice if the claimant fails to produce a sufficient expert report within the statutorily imposed timeframe, *see* TEX. CIV. PRAC. & REM. CODE § 74.351(a)–(c)." *Leibman v. Waldroup*, No. 23-0317, 2025 WL 1610583, at *4 (Tex. June 6, 2025).

**II. We determine, de novo, whether a claim is an HCLC by considering the underlying facts as presented in the record.**

Although we ordinarily review a trial court's ruling on a Chapter 74 motion for an abuse of discretion, *Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 343 (Tex. 2024), whether a cause of action is an HCLC is a matter of statutory construction, which we review de novo. *Collin Creek*, 671 S.W.3d at 885.

To determine whether a cause of action is an HCLC, "we examine the underlying nature and gravamen of the claim, rather than the way it is pleaded." *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 534 (Tex. 2016). "The gravamen of a claim is its true nature, as opposed to what is simply alleged or artfully pled, allowing courts to determine the rights and liabilities of the involved parties." *B.C. v. Steak N Shake Operations, Inc.*, 512 S.W.3d 276, 283 (Tex. 2017). We focus on the operative facts underlying the claim, not on how the pleadings describe the facts or the legal theories asserted.[2] *Collin Creek*, 671 S.W.3d at 885;

---

[2] The Supreme Court has repeatedly held that "artful pleading and recasting of claims is not permitted." *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010). "[I]f the gravamen or essence of a cause of action is a health care liability claim, then allowing the claim to be split or spliced into a multitude of other causes of

*Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012)). Because the Legislature intended for the Act to apply expansively, "claims premised on facts that *could* support claims against a physician . . . for departures from accepted standards of . . . safety or professional or administrative services directly related to health care are HCLCs, regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards." *Loaisiga*, 379 S.W.3d at 255–56 (emphasis original).

"[M]any claims implicate more than one type of standard," such as departures from standards of safety and health care. *Collin Creek*, 671 S.W.3d at 887. But "a cause of action need only concern a departure from one type of standard for the Act to apply." *Id.* at 888.

## III. Cagle's claims are HCLCs based on departures from standards for professional or administrative services directly related to health care.

### A. Statutory definitions guide our determination of whether a claim is based on departures from standards for professional or administrative services.

The Act defines "professional or administrative services" as

those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs.

---

action with differing standards of care, damages, and procedures would contravene the Legislature's explicit requirements." *Id.* at 197.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(24). A hospital's license may be suspended or revoked for failing to comply with statutes and regulations pertaining to hospital licensing. *See* Tex. HEALTH & SAFETY CODE § 241.053(a); 25 TEX. ADMIN. CODE § 133.121 (former).[3]

A departure from standards of professional or administrative services is directly related to health care when there is "an uninterrupted, close relationship or link" between the professional or administrative services and 'health care' as defined by the Act. *Carswell*, 505 S.W.3d at 536. "Health care" is "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10). An HCLC based on professional or administrative services must be "directly related to health care of *some* patient," but the claimant need not have been the patient. *Carswell*, 505 S.W.3d at 537. The Act also does not "require that the alleged injury must have occurred during or contemporaneously with health care, nor that the alleged injury was caused by health care." *Id.* at 535.

The gravamen of Cagle's complaint is that the hospital ignored her when she informed its employees that she did not want to relinquish her baby, deprived her of reasonable access to her newborn while she was inpatient, and released the

---

[3]     Currently codified at 26 TEX. ADMIN. CODE § 505.121.

9

newborn to the intended adoptive parents. This implicates several legal requirements relating to hospital licensing.

**B.     The Texas Health and Safety Code and the Texas Administrative Code include hospital licensing rules relevant to this case.**

Chapter 241 of the Health and Safety Code (the "Texas Hospital Licensing Law") requires the Department of State Health Services to adopt rules regarding "hospital services relating to patient care," "patient care and a patient bill of rights," and "compliance with other state and federal laws affecting the health, safety, and rights of hospital patients." TEX. HEALTH & SAFETY CODE § 241.026(a). The Hospital Licensing Law requires written authorization for disclosure of health care information to any person other than the patient or her legally authorized representative. *Id.* § 241.152. And it requires the Department of State Health Services to recommend hospital security procedures to reduce the likelihood of infant patient abduction, including controlling access to newborn nurseries and "footprinting, photographing, or writing descriptions of infant patients at birth." *Id.* § 241.0263(d).

The Texas Administrative Code includes regulations implementing the Texas Hospital Licensing Law. For example, hospitals must have a neonatal program that is family-centered and allows parents "reasonable access to their infants at all times." 25 TEX. ADMIN. CODE §  133.185(a). Hospitals must have a written neonatal program plan that includes, at a minimum, "written guidelines for

10

discharge planning instructions and appropriate follow-up appointments for all neonates/infants," *Id.* § 133.185(b)(2)(E), as well as training, credentialing, and annual skills and competency assessments for staff participating in the care of neonatal patients. *Id.* § 133.185(b)(2)(G), (H).

Hospitals are required to adopt a written policy regarding patient's rights that includes the patient's right "to the hospital's reasonable response to . . . her requests and needs for treatment or service, within the hospital's capacity, its stated mission, and applicable law and regulation . . . ." 25 TEX. ADMIN. CODE § 133.42 (former).[4] The patient's rights also include the right to participate in the consideration of ethical issues that arise and to information in medical records. *Id.*[5] If the patient is a minor, her "guardian, next of kin, or legally authorized responsible person" can exercise the patient's delineated rights. *Id.*[6]

A patient may designate a caregiver to provide care to the patient after discharge, however, the "patient [or] the patient's legal guardian . . . may change the designated caregiver at any time and the hospital shall note the change in the patient's medical record." 25 TEX. ADMIN. CODE § 133.50 (former)[7]; *see* TEX. FAM. CODE 161.108.

---

[4]     Currently codified at 26 TEX. ADMIN. CODE § 505.42(a)(1).
[5]     Currently codified at *id.* § 505.42(a)(1)(F), (I).
[6]     Currently codified at *id.* § 505.42(a)(1)(J).
[7]     Currently codified at *id.* § 505.50(a)(2); *id.* § 505.50(g)

**C.      Cagle's allegations about the hospital's actions while she was a patient implicate hospital licensing regulations.**

Cagle claims that the hospital ignored her when she changed her mind about relinquishing her child. She alleges that she communicated with the nurses who cared for her as well as other hospital employees while she was a patient. These are allegations that the hospital ignored her reasonable requests for service and deprived her of reasonable access to her infant. Thus, these allegations implicate the Texas Administrative Code's hospital licensing provisions. *See* 25 TEX. ADMIN. CODE § 133.42 (former)[8] (patient's rights), *Id.* § 133.185(a) (reasonable access to infant),

In addition, Cagle alleged that the hospital violated a legal duty owed to her by unilaterally deciding that the intended adoptive parents had a superior right to possession of her child. The Administrative Code provides that a patient has the right to participate in the consideration of ethical issues that arise. *See* 25 TEX. ADMIN. CODE § 133.42 (former).[9] Thus, Cagle's allegation about the hospital's unilateral determination about the right to possession of her child also implicates hospital licensing rules because her allegation is that she was excluded from the decision-making process.

---

[8]      Currently codified at *id.* § 505.42(a)(1).

[9]      Currently codified at *id.* § 505.42(a)(1)(F), (I).

12

Cagle's allegations that the hospital ignored her, deprived her of access to her newborn, and excluded her from the decision-making process involve actions that occurred while she was a patient receiving care. We conclude that there is "an uninterrupted, close relationship or link" between the hospital's alleged failures to comply with licensing requirements and the provision of health care to Cagle. *Carswell*, 505 S.W.3d at 536.

### D. Cagle's allegations about the hospital's actions while her daughter was a patient also implicate statutory and regulatory hospital licensing requirements.

Cagle alleged that the hospital failed to have a policy or procedure in place regarding discharge of a newborn when there is a dispute between the birth mother and the intended adoptive parents, or it failed to train and supervise its employees about implementation of that policy. Several provisions of the Administrative Code, together, are implicated by these allegations. First, a patient's legal guardian may designate a caregiver to care for the patient after discharge. 25 TEX. ADMIN. CODE § 133.50 (former)[10]; *see also id.* §133.42 (former).[11] Second, the Administrative Code provides that the patient or her legal guardian may "at any time" change the designated caregiver, in which case the hospital must "note the change in the patient's medical record." 25 TEX. ADMIN. CODE § 133.50 (former)[12].

---

[10] Currently codified at *id.* § 505.50(a)(2).
[11] Currently codified at id. § 505.42(a)(1)(J).
[12] Currently codified at *id.* § 505.50(g).

13

Third, the Administrative Code requires hospitals to have written guidelines for discharge planning for "all neonates/infants." *Id.* § 133.185(b)(2)(E). These guidelines must include instructions about follow up appointments or care of an infant. *Id.* Fourth, the Health and Safety Code requires written authorization for disclosure of health care information to any person other than the patient or her legally authorized representative. TEX. HEALTH & SAFETY CODE § 241.152.

Cagle's allegations about the hospital discharging her daughter to the intended adoptive parents, instead of to her, implicate hospital licensing requirements related to the provision of health care to the baby. In planning for discharge of the baby, the hospital failed to determine that the intended adoptive parents were not designated as substitute caregivers—or in any event that Cagle had withdrawn the designation. Release of the child to the intended adoptive parents would have included provision of information about care of the infant and follow up appointments, despite the absence of legal authorization to disclose protected health care information.

These allegations and facts implicate actions taken by the hospital while the baby was a patient and in regard to her care. We conclude that there is "an uninterrupted, close relationship or link" between the hospital's alleged failures to comply with licensing requirements and the provision of health care to Cagle's baby. *Carswell*, 505 S.W.3d at 536.

We have concluded that the gravamen of Cagle's claim implicates duties with which the hospital is required to comply as a condition of maintaining its license, and that there is 'an uninterrupted, close relationship or link' between the professional or administrative services implicated in this case and the health care the hospital provided to Cagle and her child. *See Carswell*, 505 S.W.3d at 536. This satisfies the second element of the statutory definition of an HCLC. Cagle's "claims premised on facts that *could* support claims against . . . a health care provider for departures from accepted standards of . . . safety or professional or administrative services directly related to health care are HCLCs . . . ." *Loaisiga*, 379 S.W.3d at 255–56. Because "a cause of action need only concern a departure from one type of standard for the Act to apply," we now consider the adequacy of the expert report. *Collin Creek*, 671 S.W.3d at 887; *see also* TEX. R. APP. P. 47.1.

IV. **The trial court did not err by denying the motion to dismiss, and on remand the court should consider whether to grant a thirty-day extension for Cagle to address deficiencies in Radcliffe's report.**

On appeal, the hospital argues that Radcliffe's report is so lacking in substance that it is no report at all, and the court was required to dismiss Cagle's suit. It asserts that Radcliffe is not qualified as an expert, and her opinion on causation is conclusory. Cagle asserts that Radcliffe is a proper expert because her suit alleges only a departure from legal standards. Cagle's argument in support of

her expert report is another way of saying that she believes her claim is not an HCLC. We have already held that her claim is a Health Care Liability Claim. While we do not agree with Cagle's argument, for good reason, we conclude that Radcliffe is an expert in this case, and Radcliffe's report is deficient but not so lacking in substance as to constitute no report at all.

## A. Standard of review

"The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

Under the Act, the trial court is required to grant the defendant health care provider's motion to dismiss with prejudice and award attorney's fees when a claimant fails to timely serve an expert report. TEX. CIV. PRAC. & REM. CODE § 74.351(b); *see Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). When a defendant challenges a plaintiff's expert report as deficient, however, the Act provides the trial court with two options: grant an extension of time to allow the plaintiff to cure the deficiencies in the report or grant the motion to dismiss. *See*

16

TEX. CIV. PRAC. & REM. CODE § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency."); *id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).").

"[W]hen an expert report can be cured in thirty days, the claim is not frivolous." *Scoresby*, 346 S.W.3d at 554. The Texas Supreme Court has noted that "there are constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause, and those limitations constrain the Legislature no less in requiring dismissal." *Id.* at 554 & n. 45 (quoting *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex. 1991) (citations omitted)). Thus, "trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Id.*; *see Ogletree v. Matthews*, 262 S.W.3d 316, 320–21 (Tex. 2007).

"[A] thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct

17

is implicated." *Scoresby*, 346 S.W.3d at 557 (describing this as "minimal standard"). "All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case." *Id.* "An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so." *Id.* at 554, 557 (holding that claimant should have opportunity to cure deficiencies in expert report when challenge asserted that neurologist's education, training, and expertise were not relevant to defendant surgeon's actions).

## B. Radcliffe is an expert under section 74.402(d).

The Act defines an "expert report" as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6).

"In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) ("The trial court should look no further than the

report itself, because all the information relevant to the inquiry is contained within the document's four corners.")). A claimant may satisfy the expert report requirement by serving reports of separate experts . . . regarding different issues arising from the conduct of a . . . health care provider, such as issues of liability and causation." TEX. CIV. PRAC. & REM. CODE § 74.351(i).

"With respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in *any health care liability claim*, [an expert must be] a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *Id.* § 74.351(r)(5)(C) (emphasis added). For the purposes of an expert report when the defendant is a hospital, an expert must be qualified to testify under section 74.402 of the Texas Civil Practice and Remedies Code. *Id.* § 74.351(r)(5).

Section 74.402 provides that a person may qualify as an expert witness

> In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

19

(2)    has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b).

"Practicing health care includes: (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider." *Id.* § 74.402(a). "Health care institution" includes a hospital, *Id.* § 74.001(a)(11)(G), and "health care provider" includes a "health care institution." *Id.* § 74.001(a)(12)(A). "'Health care' means any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10).

The Texas Supreme Court has cautioned courts that the Act's test for expert qualifications should not be too narrowly drawn or rigidly applied "because it is expressly nonexclusive." *Benge v. Williams*, 548 S.W.3d 466, 472 (Tex. 2018). Section 74.402(d), an exception to the statutory criteria for expert qualification, provides that the "court" "may depart" from the statutory criteria in section

20

74.402(a)–(c), "if, under the circumstances, the court determines that there is good reason to admit the expert's testimony." TEX. CIV. PRAC. & REM. Code §74.402(d). In such a circumstance, the court "shall state on the record the reason for admitting the testimony if the court departs from the criteria." *Id.* "Court" means "any federal or state court," which necessarily includes this Court. TEX. CIV. PRAC. & REM. CODE § 74.001(a)(4).

In *Packard v. Guerra*, the Fourteenth Court of Appeals relied in part on section 74.402(d) to hold that the trial court did not abuse its discretion by considering and relying on an expert report from a corporate lawyer. 252 S.W.3d 511, 513 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). When the plaintiffs' baby was born, the doctor delivering the child allegedly committed medical errors that caused the newborn to suffer "permanent, severe brain damage." *Id.* at 513. The plaintiff-parents sued the treating physician and various entities that were allegedly "in charge of managing and staffing the emergency room." *Id.* They also sued two additional doctors individually and in their capacities as officers, directors, members, shareholders, or employees of the defendant entities. *Id.* The parents served several expert reports from physicians and one report from a corporate lawyer, in which she explained issues of corporate and director responsibility, relationships of control among the entities, the entities'

responsibility to implement their own policies and procedures, facts and relationships underlying several theories of vicarious liability. *Id.* 514, 517.

The court of appeals listed the various contracts, corporate documents, financial records, and employment records that the lawyer reviewed in preparing her report. *Id.* at 531. And the court of appeals also took notice that when seven similarly-named corporate entities had been sued, the lawyer's report addressed only three entities and two individual doctors associated with them. *Id.* In her report, the lawyer "connected the dots" between the three companies, two individual doctors, and the expert reports from three physicians. *Id.* The court of appeals then explained the reasons for departing from the ordinary criteria for expert qualifications and considering the lawyer's report as an expert report:

> Few, if any, doctors would be qualified to examine the records [the corporate lawyer] reviewed and acquire the same depth of knowledge or clarity. Few, if any, doctors would be able to focus in so sharply on the relationships they claim are important. Yet, this was the expertise that was required to winnow the unnecessary parties from the necessary parties and to connect the dots among the corporate and individual responsibilities.

> If [the lawyer] were not allowed to "connect the dots" between each entity (and individual) and its (or their) responsibility for training programs or management of emergency rooms, [the physician experts] would not be able to prepare a sufficient report for each entity (and individual). In fact, initially, [two physician experts] were unable and/or unqualified to "connect the dots" and the trial court found their reports insufficient. But with [the corporate lawyer's] report explaining the "contractual and corporate inter-relationships of the various defendants" along with their duties to each other and to Polly Ryon Memorial Hospital, [the physician experts'] new reports

22

> sufficiently explained each of the defendant's standard of care, breach, and causation. [The corporate lawyer's] report connected the dots for the physicians.

*Id.*

Cagle served an expert report written by Radcliffe, a practicing attorney and former family law judge. Radcliffe's curriculum vitae lists her education, experience, associations, and accomplishments. She attended law school, became licensed by the Texas State Bar Association, belonged to numerous professional associations and legal task forces, lectured at many seminars and continuing legal education conferences, and received awards including "Outstanding Young Lawyer of Galveston County." Most of her experience involves family law. But Radcliffe is not a doctor. She did not go medical school, hold any medical licenses, or work for a hospital in a professional or administrative capacity. Nothing in her CV indicates that Radcliffe ever was a health care provider or consulting health care provider. Nothing in her CV indicates that she had education, training, or experience in hospital licensing or discharge planning. Accordingly, we conclude that Radcliffe is not an expert under section 74.402(b). *See* TEX. CIV. PRAC. & REM. CODE § 74.402(b).

We believe, however, that there is 'good reason' to depart from the criteria in sections 74.402(a)–(c). *See id.* § 74.402(d). Cagle alleges that the hospital gave her baby to the wrong parents instead of releasing the baby to her. We have

23

explained that her complaint implicated various hospital licensing standards, and why this therefore requires a conclusion that her case is an HCLC for which an expert report is required. A hospital employee or physician could opine about what documentation is necessary to release a newborn to a third party, or the injurious and detrimental effect of prolonged separation between a newborn and her mother. Few, if any, doctors or health care providers would be qualified to opine about Cagle's parental rights. Such an opinion would be necessary to connect the hospital's alleged breach of licensing regulations to Cagle's alleged injury. *See Cornejo*, 446 S.W.3d at 123 (noting that trial court may not draw inferences from expert reports and must "exclusively rely" on information in report itself). Opinion testimony like that provided by Radcliffe would 'connect the dots' from a breach of licensing rules to Cagle's alleged injury by showing that she was the baby's legal guardian and had a superior right to possession and custody of her child. We conclude that Radcliffe is an expert under the Act because there are good reasons to depart from the section 74.402(a)–(c) criteria.

### C. Radcliffe's expert report is deficient, but the trial court may grant an extension of time to cure deficiencies.

Courts should be lenient in granting extensions to cure deficiencies because "when an expert report can be cured in thirty days, the claim is not frivolous." *See Scoresby*, 346 S.W.3d at 554. This leniency is a way to effectuate the legislative purpose of the expert report requirement, which is to deter frivolous claims without

24

impeding a party's right to pursue potentially meritorious claims. *Leibman*, 2025 WL 1610583, at *4. The Supreme Court has held that "a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Scoresby*, 346 S.W.3d at 557.

In her report, Radcliffe stated her credentials and identified the evidence she reviewed and considered in writing her report. She summarized what the hospital did, stated what standards applied, identified what the hospital should have done instead, and opined that the hospital's actions caused Cagle's injury. Among other things, Radcliffe stated that the hospital's staff refused to provide Cagle access to her own child and completed a birth certificate listing the child's last name as that of the intended adoptive parents. In addition, the hospital refused to release the baby to Cagle, and it instead released the child to the intended adoptive parents despite the absence of any legal determination that they had a superior right to the child. Radcliffe explained the legal rights of a natural parent, and the limitations on authority of a hospital or temporary caregiver. Radcliffe stated that Cagle suffered mental anguish, emotional distress, loss of consortium, depression, and other symptoms due to the deprivation caused by the hospital's actions. Finally, she

opined that the hospital's actions resulted in Cagle being deprived of her child for two years and caused Cagle's alleged injuries.

Radcliffe's report is deficient in at least two ways. First, she is not a physician, and a physician must provide opinion testimony on causation. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(C). Second, Radcliffe was not practicing health care. The report lacks opinion testimony from a person practicing health care on the standards and breach thereof pertaining to the professional and administrative services identified in this opinion. But *Scoresby* teaches that all deficiencies are subject to cure so long as the expert report contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. *Scoresby*, 346 S.W.3d at 557.

In all but the most vanishingly rare cases, an expert report from a lawyer would be no report at all when the lawyer is not a physician or practicing health care. In light of the unusual circumstances presented here, however, we consider this case to be one such vanishingly rare case. Still, even in *Packard*, the court of appeals considered the corporate lawyer's report as a complement to—not a substitute for—reports from physicians and individuals practicing health care. *See Packard*, 252 S.W.3d at 513, 533. Because we have concluded that Radcliffe is an individual with expertise in this case, we can further conclude that her report meets the minimal *Scoresby* standard. Radcliffe's report includes her opinion that Cagle's

26

claim has merit, and it implicates the hospital's conduct. However, in reaching this conclusion, we do not hold that Radcliffe's report alone satisfies the Act's expert report requirements or that early dismissal is not required. Rather, we hold only that Radcliffe's report meets the minimal *Scoresby* standard for remand to the trial court to cure deficiencies because early dismissal of Cagle's claims is not required *yet*. Should Cagle be given, on remand, a thirty-day extension to cure the deficiencies in her report, any further trial court ruling on the hospital's motion to dismiss will depend on whether Cagle timely serves one or more additional, compliant expert reports from physicians or individuals practicing health care. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5); *id.* § 74.402.

## Conclusion

We reverse the trial court's order denying the hospital's motion to dismiss. We remand this case to the trial court to determine whether to grant Cagle a thirty-day extension to file an expert report or reports that are compliant with the Act and for further proceedings consistent with this opinion.


Susanna Dokupil
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.